# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

FLOYD GENE PERKINS,

        Defendant-Appellant.

FOR PUBLICATION
January 19, 2016
9:10 a.m.

No. 323454
Genesee Circuit Court
LC No. 13-032653-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

AARON WILLIAMS,

        Defendant-Appellant.

No. 323876
Genesee Circuit Court
LC No. 13-033526-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KENYA ALI HYATT,

        Defendant-Appellant.

No. 325741
Genesee Circuit Court
LC No. 13-032654-FC

---

Before: TALBOT, C.J., and CAVANAGH and K. F. KELLY, JJ.

K. F. KELLY, J.

These three defendants were tried jointly before separate juries. A jury convicted defendant Floyd Gene Perkins (Perkins) of first-degree felony murder, MCL 750.316(b), conspiracy to commit armed robbery, MCL 750.157a, armed robbery, MCL 750.529, and felony-

-1-

firearm, MCL 750.227b(1). Perkins was sentenced to life in prison for the murder conviction, 285 months to 50 years' imprisonment for both the conspiracy to commit armed robbery and armed robbery convictions, and two years' imprisonment for the felony-firearm conviction. On appeal, Perkins argues: (1) there was insufficient evidence to support his murder conviction; (2) his confession violated the Fifth and Sixth Amendments; and, (3) the judgment of sentence must be amended because Perkins' felony-firearm conviction was erroneously ordered to be served consecutively to his conviction for conspiracy to commit armed robbery. We agree that the matter must be remanded for the ministerial task of correcting Perkins' judgment of sentence, but in all other respects we affirm Perkins' convictions and sentences.

A jury convicted defendant Aaron Williams (Williams) of conspiracy to commit armed robbery, armed robbery, felon in possession of a firearm, MCL 750.224f, and felony-firearm. The jury could not reach a verdict on the felony murder charge. Williams was sentenced as a fourth habitual offender to 25 to 50 years' imprisonment for each of the conspiracy to commit armed robbery and the armed robbery convictions, 30 months to 60 months' imprisonment for the felon in possession conviction, and two years' imprisonment for the felony-firearm conviction. In lieu of a retrial on the felony murder charge, Williams later pleaded no contest to second-degree murder, for which he later received a 35 to 50 year prison term. On appeal, Williams argues there was insufficient evidence that he committed armed robbery and the trial court erred in assessing the same amount of restitution against Williams as it had against his more culpable codefendants. We affirm Williams' convictions and sentences.

A jury convicted Kenya Ali Hyatt (Hyatt) of first-degree felony murder, conspiracy to commit armed robbery, armed robbery, and felony-firearm. Because Hyatt was 17 years old when the offense occurred, the trial court held a *Miller*[1] hearing to determine Hyatt's sentence. It ultimately sentenced Hyatt to life without the possibility of parole for the murder conviction, 210 months to 40 years' imprisonment for each of the conspiracy to commit armed robbery and armed robbery convictions, and two years' imprisonment for the felony-firearm conviction. On appeal, Hyatt argues: 1) a police officer impermissibly encroached on the province of the jury when he identified Hyatt in a surveillance video; 2) the trial court erred in failing to instruct the jury on accident; and, 3) his sentence must be vacated because the determination of whether a juvenile should receive a life without parole sentence must be made by a jury. In light of this Court's decision in *People v Skinner*, ___ Mich App ___; ___ NW2d ___ (Docket No. 317892, issued August 20, 2015), Hyatt must be resentenced so that a jury may determine whether he should receive life in prison without the possibility of parole. We otherwise affirm Hyatt's convictions and sentences. However, were it not for *Skinner*, we would affirm the sentencing court's decision to sentence Hyatt to life imprisonment without the possibility of parole. We therefore declare a conflict with *Skinner* pursuant to MCR 7.215(J)(2).

## I. BASIC FACTS

---

[1] *Miller v Alabama*, ___ US ___; 132 S Ct 2455, 2457; 183 L Ed 2d 407 (2012).

On August 14, 2010, the victim, a security guard at River Village Apartments in Flint, was killed after being shot multiple times. Perkins, Williams and Hyatt each gave statements to police officer Terence Green, and each implicated himself in the murder. The statements revealed that Perkins and his family were in danger because of a dispute Perkins had with an individual. Perkins wanted to obtain a firearm to help him protect his family. Williams and Hyatt were Perkins' cousins, but were not related to one another. The three individuals devised a plan in which Perkins could obtain a gun. Williams lived in the apartment complex where the murder took place and knew that the security guards who worked there were armed. Williams borrowed a gun from an individual known as "Chief." The idea was that Perkins, Hyatt and Williams would use the borrowed gun to rob one of the security guards of his firearm. On the night of the shooting, Williams acted drunk and disorderly in the apartment complex's parking lot in order to lure the victim out of his security car. When the victim approached Williams, Perkins and Hyatt approached from behind. Perkins grabbed the victim and held him while Hyatt drew the gun he had received from Williams. Both Perkins and Hyatt indicated that the victim reached for Hyatt's gun and the gun discharged. After that first shot, Perkins grabbed the victim's side-arm and ran away. Perkins heard additional shots as he was fleeing. Hyatt maintained that the first shot was accidental and that he subsequently "blacked out" and could not remember what happened afterwards.

An autopsy revealed that the victim had been shot three times, although there were four gunshot wound paths. One bullet wound entered the back left side of the victim's scalp, exiting near the forehead, grazing the left cheek. This same bullet then entered the top of the left shoulder, with the bullet ending up deep in the muscle on the left side of the back thorax area. Another bullet entered behind the left ear and exited the right cheek. This bullet went through the spine, severing the spinal cord. A third bullet, and fourth path, entered the left chest region and was recovered from the lower back. This bullet went through the lung, causing significant injury to the lung and bleeding inside the left chest area. While all gunshot wounds had the potential to be fatal, the pathologist testified that two were immediately incapacitating – the one that entered behind the left ear and severed the spine and the one on the left side of the chest that caused significant internal bleeding. There was no way to tell which bullet came first.

As previously indicated, Perkins, Williams and Hyatt were tried jointly before separate juries. They were convicted and sentenced as outline above and now appeal as of right.

## II.  DOCKET NO. 323454 (PERKINS' APPEAL)

### A.  SUFFICIENCY OF THE EVIDENCE

Perkins argues that there was insufficient evidence to support his felony murder conviction. Specifically, Perkins argues that the victim was not killed "while in the perpetration

or attempted perpetration of a robbery" because the robbery was complete when Perkins took the victim's gun and fled from the scene.[2] We disagree.

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "Taking the evidence in the light most favorable to the prosecution, the question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Id.* at 428. "The requirements of the aiding and abetting statute are a question of law that this Court reviews de novo." *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006) (footnote omitted).

In order to be convicted of first-degree felony murder, the prosecution had to prove the following elements:

> (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316(1)(b) . . .]. [*People v Smith*, 478 Mich 292, 318-19; 733 NW2d 351 (2007) (internal quotation marks omitted).]

While Perkins did not fire the fatal shots, the aiding and abetting statute, MCL 767.39, provides that a defendant may be convicted as a principal if he aided or abetted in the commission of a charged crime. The statute reads:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

Therefore, in order to be convicted under an aiding and abetting theory, the prosecution must prove:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the

---

[2] Perkins does not challenge his convictions for armed robbery, conspiracy to commit armed robbery, or felony-firearm and concedes his participation in the armed robbery.

defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006).]

More specifically to this particular case:

> To prove felony murder on an aiding and abetting theory, the prosecution must show that the defendant (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony. [*People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003).]

"The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004). "In determining whether a defendant assisted in the commission of the crime, the amount of advice, aid, or encouragement is not material if it had the effect of inducing the commission of the crime." *Id.* at 71. Whether and to what extent a defendant acts or gives encouragement "must be determined on a case-by-case basis." *Id.*

The facts in *Robinson* are similar to the case at bar. In *Robinson*, the defendant agreed with his codefendant that they would go to the victim's house and "f*** him up." The defendant drove to the victim's home and provided the first blows to the victim. Once the victim was on the ground, the codefendant began to kick the victim. The defendant told his codefendant "that was enough" and began to walk back to the car when he heard a single gunshot; the codefendant had shot the victim. The trial court found the defendant guilty of second-degree murder. This Court reversed, holding that there was insufficient evidence to support the defendant's conviction because there was no evidence establishing that the defendant was aware of his codefendant's intent to kill the victim. *Id.* at 4-5. Our Supreme Court reversed, holding that the natural and probable consequence of aggravated assault was death. While the defendant may have only intended to assault the victim, it was foreseeable that a plan to assault someone could "escalate the assault to murder" and the fact that the defendant "serendipitously left the scene of the crime moments before [the] murder does not under these circumstances exonerate him from responsibility for the crime." *Id.* at 11-12. The Court explained that "sharing the same intent as the principal allows for accomplice liability. However, sharing the identical intent is not a *prerequisite* to the imposition of accomplice liability." *Id.* at 14. The Court held:

> [A] defendant must possess the criminal intent to aid, abet, procure, or counsel the commission of an offense. A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the offense he intends to aid or abet. Therefore, the prosecutor must prove beyond a reasonable doubt that the defendant aided or abetted the commission of an offense and that the defendant intended to aid the charged offense, knew the principal intended to commit the charged offense, or, alternatively, that the charged offense was a

-5-

natural and probable consequence of the commission of the intended offense. [*Id.* at 15.]

The prosecution presented sufficient evidence to convict Perkins of felony murder. Perkins, along with Williams and Hyatt, devised a plan to take a gun from a security guard. Perkins grabbed the victim and held him while Hyatt drew his own gun. Hyatt shot the victim while Perkins was holding him. While Perkins may have fled the scene after the first shot, he is not exonerated from Hyatt's subsequent action where the victim's death was a natural and probable consequence of the armed robbery. A reasonable jury could conclude that Perkins disregarded the likelihood that the natural tendency of his acts was to cause death. Clearly Perkins (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony.

Defendant argues that he had reached temporary safety before the fatal shots. However, the victim was shot multiple times with one of those shots coming when Perkins was still holding the victim. There is no clear indication of which shot actually killed the victim. Therefore, it is conceivable that the shot fired while Perkins held the victim was the one that actually caused the victim's death. At a minimum, the shot contributed to the victim's death. Perkins tries to separate his acts of assistance during the armed robbery from Hyatt's act of shooting the victim, relying heavily on the fact that he was attempting to leave the location. The jury could have inferred from the evidence, however, that Perkins assisted in the murder by actively participating in the underlying offense, i.e., the armed robbery, and that the shooting was a natural and probable result of the armed robbery.

## B. ADMISSIBILITY OF PERKINS' STATEMENT

Perkins next argues that his confession should have been suppressed because the investigating officer, Terence Green, knew that Perkins was in jail on an unrelated offense and was represented by counsel and nevertheless questioned Perkins without his attorney and because the officer lied to him about incriminating physical evidence. We disagree.

This Court reviews de novo a trial court's ultimate decision on a motion to suppress evidence. Although this Court engages in a review de novo of the entire record, this Court will not disturb a trial court's factual findings with respect to a *Walker*[3] hearing unless those findings are clearly erroneous. [A] finding is clearly erroneous if it leaves us with a definite and firm conviction that the trial court has made a mistake. [*People v Akins*, 259 Mich App 545, 563-64; 675 NW2d 863 (2003) (internal quotation marks, citations and footnotes omitted.]

---

[3] *People v Walker (On Rehearing)*, 374 Mich 331, 132 NW2d 87 (1965).

Perkins argues that the trial court erred in admitting his statement to police where the statement violated his right to counsel under both his Fifth and Sixth Amendment rights. Our Court has explained the interplay between these two amendments:

> The right to counsel is guaranteed by both the Fifth and Sixth Amendments of the United States Constitution, as well as Const. 1963, art. 1, §§ 17 and 20. However, these constitutional rights are distinct and not necessarily coextensive. The Sixth Amendment directly guarantees the right to counsel in all criminal prosecutions, while the Fifth Amendment right to counsel is a corollary to the amendment's stated right against self-incrimination and to due process. The right to counsel guaranteed by the Michigan Constitution is generally the same as that guaranteed by the Sixth Amendment; absent a compelling reason to afford greater protection under the Michigan Constitution, the right to counsel provisions will be construed to afford the same protections. [*People v Marsack*, 231 Mich App 364, 372-73; 586 NW2d 234 (1998) (internal citations omitted).]

The Sixth Amendment, as applied to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to have an attorney assist in his defense. *People v Russell*, 471 Mich 182, 187; 684 NW2d 745 (2004), cert den 543 US 1095 (2005). "The Sixth Amendment guarantees a defendant the right to have counsel present at all critical stages of the criminal proceedings." *Missouri v Frye*, ___ US ___; 132 S Ct 1399, 1405; 182 L Ed 2d 379 (2012) (internal quotation marks omitted). "[O]nce this right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective." *McNeil v Wisconsin*, 501 US 171, 175; 111 S Ct 2204, 2207; 115 L Ed 2d 158 (1991). However, the Sixth Amendment right "is offense-specific and cannot be invoked once for all future prosecutions." *People v Smielewski*, 214 Mich App 55, 60; 542 NW2d 293 (1995). Instead, it "attaches only at or after adversarial judicial proceedings have been initiated." *Id*. This is because excluding "evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities." *McNeil*, 501 US at 176. Our Court has explained:

> [O]nce the Sixth Amendment right to counsel has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective with respect to the formal charges filed against the defendant. Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses. Indeed, a defendant's request for court-appointed counsel at an arraignment does not invalidate a waiver of the defendant's right to counsel under *Miranda* during a subsequent police-initiated interrogation concerning a different and unrelated offense. Thus, when a defendant is interrogated after being arraigned and the interrogation involves charges unrelated to the arraigned charges, the defendant's Sixth Amendment right invoked at arraignment—the initiation of the criminal prosecution—is inapplicable to the interrogation. [*Smielewski*, 214 Mich App at 61.]

The record reveals that adversarial judicial proceedings for the instant case had not yet begun when Perkins confessed. At the *Walker* hearing, Green testified that he knew that Perkins

-7-

was in jail on an unrelated home invasion charge. Green never bothered to see whether Perkins had been arraigned on the home invasion charge or whether there was an attorney of record. Because the Sixth Amendment right to counsel is offense specific and because adversarial judicial proceedings had not been initiated for the offenses in this case, Perkins' right to counsel under the Sixth Amendment had not yet attached and the trial court properly denied Perkins' motion to suppress his confession on that basis.

Perkins nevertheless claims that his statement was involuntary. The Michigan Supreme Court has held:

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

> The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. [*People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988).]

Perkins claims that his statement was involuntary because Green lied to him about what evidence existed in the case. Green admitted that he told Perkins there was video, DNA, and fingerprint evidence, even after Green assured Perkins at the outset of their conversation that he would "never lie to" Perkins. The fact that police lie to a suspect about the evidence against him does not automatically render an otherwise voluntary statement involuntary. *People v Hicks*, 185 Mich App 107, 113; 460 NW2d 569 (1990). Instead, misrepresentation by the police is just one factor to be considered; the focus remains the totality of the circumstances.

Green testified that he questioned Perkins on February 20, 2013 at approximately 4:55 p.m.. Perkins was over 21 years old and had both a G.E.D. and a high school diploma. Perkins could read and write the English language. Perkins had previous contact with the police and the criminal justice system and, as previously mentioned, was in jail for home invasion. Perkins was not deprived of food, sleep, or medical attention, and he was not injured, intoxicated, or drugged. There is no evidence that Perkins was physically abused, or threatened with abuse. The interview was short, lasting only an hour. Perkins was advised of and waived his *Miranda* rights before speaking with Green and never requested an attorney. Therefore, even if Green lied to Perkins regarding the evidence against him, the trial court did not err in determining that defendant's statement was voluntarily made under the totality of the circumstances.

## C. JUDGMENT OF SENTENCE

Finally, Perkins argues that the trial court erred in ordering that Perkins' felony-firearm sentence run consecutively to Perkins' conspiracy to commit armed robbery sentence. The prosecution concedes error on this point.

At the time of Perkins' sentence, the felony-firearm statute provided, in relevant part:

> (1) A person who carries or has in his or her possession a firearm when he or she commits or attempts to commit a felony, . . . is guilty of a felony, and shall be imprisoned for 2 years. . . .

> (2) A term of imprisonment prescribed by this section is in addition to the sentence imposed for the conviction of the felony or the attempt to commit the felony, and shall be served consecutively with and preceding any term of imprisonment imposed for the conviction of the felony or attempt to commit the felony. [MCL 750.227b.]

Our Supreme Court has held:

> From the plain language of the felony-firearm statute, it is evident that the Legislature intended that a felony-firearm sentence be consecutive only to the sentence for a specific underlying felony. Subsection 2 clearly states that the felony-firearm sentence "shall be served consecutively with and preceding any term of imprisonment imposed for the conviction of the *felony* or attempt to commit the *felony.*" It is evident that the emphasized language refers back to the predicate offense discussed in subsection 1, i.e., the offense during which the defendant possessed a firearm. No language in the statute permits consecutive sentencing with convictions other than the predicate offense. [*People v Clark*, 463 Mich 459, 463-64; 619 NW2d 538 (2000) (internal footnotes omitted).]

Perkins' judgment of sentence should be amended to reflect that his felony-firearm sentence does not run consecutively to his conspiracy to commit armed robbery sentence.

## III. DOCKET NO. 323876 (WILLIAMS' APPEAL)

## A. RESTITUTION

Williams first argues that the trial court erroneously assessed the full amount of restitution against him when he was merely an aider and abettor to crimes less than murder. He points out that he was not convicted of felony murder and was only liable for the impact of *his* conduct on the victim, not the criminal acts of others. This issue is moot and has been waived.

In lieu of a second trial, Williams pleaded no contest to second-degree murder. Notably, the judgment of sentence from the murder conviction includes the same order of restitution as the previous judgment of sentence. Williams tried unsuccessfully to withdraw his guilty plea in the trial court. He sought delayed application for leave to appeal, which this Court denied. *People v Williams*, unpublished order of the Court of Appeals, entered August 4, 2015 (Docket No.

328103), lv pending. Therefore, as of now, the judgment of sentence from Williams' murder conviction stands. The restitution order for the murder conviction is the same as the restitution for this case. Under those circumstances, "this Court is unable to provide a remedy for the alleged error" and the issue is deemed moot. *People v Tombs*, 260 Mich App 201, 220; 679 NW2d 77 (2003).

Moreover, the issue has been waived. "[I]n general, an appellant may not benefit from an alleged error that the appellant contributed to by plan or negligence." *People v Witherspoon*, 257 Mich App 329, 333; 670 NW2d 434 (2003). At Williams' August 11, 2014 sentence, the following exchange took place:

> THE COURT: . . .
>
> Restitution, as previously indicated for the co-defendant in this matter, total $689,688.68; partially los[t] wages, partially funeral bill and partially workers compensation as set forth on page five of this [presentence investigation] report.
>
> MR. COTTON [defense counsel]: Judge, I would just ask that that restitution be joint and severally certain, your Honor.
>
> THE COURT: It is. It's all joint and several.
>
> MR. COTTON: Thank you, your Honor.

"[A] party cannot request a certain action of the trial court and then argue on appeal that the action was error." *People v McCray*, 210 Mich App 9, 14; 533 NW2d 359 (1995). Defense counsel seems to have "undoubtedly inadvertently, created the very error that it wishes to correct on appeal." *People v Szalma*, 487 Mich 708, 726; 790 NW2d 662 (2010). But "a party may not harbor error at trial and then use that error as an appellate parachute." *Id.*

## B. SUFFICIENCY OF THE EVIDENCE

Williams argues that there was insufficient evidence to support his convictions for armed robbery and conspiracy to commit armed robbery. Williams writes: "There is no evidence that Williams knew that anyone intended to commit an *armed* robbery that night. . . .The prosecution did not prove that Williams had conspired to be part of anything more than an *unarmed* robbery done to steal a firearm." We disagree.

"The essential elements of an armed robbery are (1) an assault, and (2) a felonious taking of property from the victim's person or presence, while (3) the defendant is armed with a weapon described in the statute." *People v Henry (After Remand)*, 305 Mich App 127, 142; 854 NW2d 114 (2014). "A conspiracy is a partnership in criminal purposes. The gist of the offense of conspiracy lies in the unlawful agreement between two or more persons. Establishing a conspiracy requires evidence of specific intent to combine with others to accomplish an illegal objective." *People v Blume*, 443 Mich 476, 505 NW2d 843 (1993) (internal quotation marks and citations omitted).

As previously stated, the aiding and abetting statute, MCL 767.39, provides that a defendant may be convicted of a crime if he aided or abetted in the commission of the crime. Williams admitted that he, Perkins and Hyatt discussed the need to rob a security guard in order to obtain a weapon. Williams borrowed a gun for the group. In fact, Williams concedes that the evidence was sufficient to support his convictions for felon in possession of a firearm and felony-firearm based on his admission to Green that he obtained the gun from a man known as "Chief." Not only did Williams provide the weapon, but he acted in a drunk and disorderly way in order to lure the victim out of his car, making the victim an easier target for Perkins and Hyatt. Hyatt shot the victim with the gun that Williams procured. It is disingenuous for Williams to now argue that he did not expect an armed robbery when, in fact, he provided a gun to accomplish the armed robbery. There was overwhelming evidence to support Williams' convictions for armed robbery and conspiracy to commit armed robbery.

## IV.  DOCKET NO. 325741 (HYATT'S APPEAL)

### A.  IDENTIFICATION TESTIMONY

Hyatt argues that Green invaded the province of the jury by offering his opinion that certain video footage and still frames from the stairwell of the apartment building where the murder occurred were of Hyatt. We agree that the trial court abused its discretion when it allowed Green to identify Hyatt in a surveillance video, but conclude that the error was harmless.

"We review for an abuse of discretion the trial court's evidentiary rulings that have been properly preserved. An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Fomby*, 300 Mich App 46, 48; 831 NW2d 887 (2013) (internal quotation marks and citation omitted).

The following exchange took place while the prosecutor questioned Green:

> *Q*. Camera two. Okay. . . . can you tell us who is coming down these stairs when you can see them?
>
> MR. SKINNER [defense counsel]: I'm gonna object to that question.
>
> BY MS. HANSON [prosecutor]:
>
> *Q*. Who is that?
>
> *A*. That's Kenya Hyatt.
>
> *Q*. Okay.
>
> MR. SKINNER: Judge, can I be heard?
>
> THE COURT: I'm hearing you.
>
> MR. SKINNER: All right. It's too late now for my objection.

THE COURT: Well, I'm gonna overrule the objection. But you can make a separate record at a later time.

Green then testified that, as Hyatt neared the bottom of the stairs, "you can clearly see him make a motion. Left hand crosses the body. Right hand touches the hip," which Green believed was an attempt to conceal a weapon.

The testimony at issue constituted lay opinion testimony. *Fomby*, 300 Mich App at 50. MRE 701 provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." However, Green's testimony invaded the province of the jury. In *Fomby*, this Court cited with support federal case law that "the issue of whether the defendant in the courtroom was the person pictured in a surveillance photo [is] a determination properly left to the jury." *Fomby*, 300 Mich App at 52. In such a situation, there is no reason to believe that the witness who offered the identifying testimony was "more likely to identify correctly the person than is the jury." *Id.* (internal quotation marks omitted).

Unlike the witness in *Fomby* who testified that the individual in the video footage was the same individual in still images but did not specifically identify the defendant as the individual in the images, Green affirmatively identified Hyatt as the individual in the stairwell. Green could properly comment that, based on his experience, the individual appeared to be concealing a weapon, but Green should not have been allowed to identify Hyatt as that individual. "[W]here a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." *People v Drossart*, 99 Mich App 66, 80; 297 NW2d 863 (1980). There was nothing about the images (i.e. poor quality of the images, defendant wearing a disguise) that necessitated Green's opinion. This is evidenced by the trial court's own statement during defense counsel's objection that "I would have no trouble making an identification myself."

However, even if the trial court abused its discretion, reversal is not warranted where the error was not outcome determinative. "Under MCL 769.26, a preserved, nonconstitutional error is not grounds for reversal unless, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative. Similarly, MCR 2.613(A) provides that an error is not grounds for disturbing a judgment unless refusal to take this action appears to the court inconsistent with substantial justice." *People v Williams*, 483 Mich 226, 243; 769 NW2d 605 (2009) (internal quotation marks and citation omitted). "An error is outcome determinative if it undermined the reliability of the verdict." *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010). When determining whether the verdict has been undermined, an appellate court must "focus on the nature of the error in light of the weight and strength of the untainted evidence." *Id.*

Here, evidence of Hyatt's guilt was overwhelming. In fact, the assailants' identities were not reasonably in dispute. Hyatt confessed to helping plan the robbery. He armed himself with a gun that Williams gave him. Although the plan was simply to scare the security guard and take his weapon, Hyatt shot the victim at least three times. Hyatt clearly admitted that he was the

shooter. His identity was not at issue and, therefore, Green's testimony was ultimately of no consequence.

## B. JURY INSTRUCTIONS

Hyatt next argues that the trial court erred when it declined Hyatt's request to instruct the jury on accident. We disagree.

"[J]ury instructions that involve questions of law are also reviewed de novo. But a trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) (internal quotation marks and citation omitted).

"Challenges to jury instructions are considered in their entirety to determine whether the trial court committed error requiring reversal." *People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012). "Jury instructions must clearly present the case and the applicable law to the jury. The instructions must include all elements of the charged offenses and any material issues, defenses, and theories *if supported by the evidence*." *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005) (emphasis added, internal citation omitted). Therefore, "when a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge. *People v Mills*, 450 Mich 61, 80-81; 537 NW2d 909, modified on other grounds 450 Mich 1212 (1995). However, a trial court is not required to give a requested instruction "where the theory is not supported by evidence." *Id.* Even when a defendant has been charged with first-degree murder and claims a firearm accidentally discharged, failure to instruct on accident is not subject to automatic reversal but is subject to review for harmless error. *People v Hawthorne*, 474 Mich 174, 181; 713 NW2d 724 (2006). In the event of an instructional error, a defendant must "demonstrate that it is more probable than not that the failure to give the requested lesser included misdemeanor instruction undermined reliability in the verdict." *People v Cornell*, 466 Mich 335, 364; 646 NW2d 127 (2002).

Defense counsel asked that the jury be instructed as to accident under CJI2d 7.1 or self-defense under CJI2d 7.2, in light of the fact that there was record evidence that the gun simply discharged when the victim attempted to grab it from Hyatt. The trial court declined to give either instruction because "I do not think there's any evidence or sufficient evidence . . . that would support the theory that the handgun he was holding discharged accidentally during a struggle with [the victim]."

There was no evidence to support Hyatt's theory that the shooting was accidental. Hyatt did not testify at trial, so the only evidence that the shooting was accidental was Hyatt's statement to Green that the victim grabbed the gun with both hands and it "just went off," as well as Perkins' statement that the victim reached for the gun and it discharged. Had the victim been shot only once, the record might have supported an accident instruction. However, Hyatt fails to address the fact that the victim was shot at least three times. That would mean that, even if the first shot was accidental, Hyatt shot the victim at least two additional times. Under those circumstances, no rational view of the evidence would support an accident instruction.

## C. SENTENCING

-13-

Finally, Hyatt argues that he was entitled to have a jury determine whether he should receive a sentence of life without the possibility of parole. In light of *Skinner*, we are compelled to remand for resentencing. However, we believe that *Skinner* was wrongly decided.

In *Miller v Alabama*, ___ US ___; 132 S Ct 2455, 2457; 183 L Ed 2d 407 (2012), the United States Supreme Court held that *mandatory* life imprisonment without the possibility of parole for those under the age of 18 when they committed a crime violated the Eighth Amendment's, US Const VIII, prohibition against cruel and unusual punishment. *Miller,* 132 S Ct 2455. The Court concluding that juveniles were different from adults:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him-and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors . . . or his incapacity to assist his own attorneys. . . .And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it. [*Id.* at 2468.]

However, the Court fell short of categorically barring life without parole for juvenile offenders; instead, it held that a sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 2469.

Our Courts have since struggled with what, exactly, *Miller* requires. See *People v Eliason*, 300 Mich App 293; 833 NW2d 357 (2013); *People v Carp*, 298 Mich App 472; 828 NW2d 685 (2012). In *Carp,* this Court noted that "the only discretion afforded to the trial court in light of our first-degree murder statutes and *Miller* is whether to impose a penalty of life imprisonment without the possibility of parole or life imprisonment with the possibility of parole" guided by "the following nonexclusive list of factors":

> (a) the character and record of the individual offender [and] the circumstances of the offense, (b) the chronological age of the minor, (c) the background and mental and emotional development of a youthful defendant, (d) the family and home environment, (e) the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressure may have affected [the juvenile], (f) whether the juvenile might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth, and (g) the potential for rehabilitation. [*Carp,* 298 Mich App at 532, citing *Miller*, 132 S Ct at 2467–2468 (quotation marks and citations omitted).]

Our Legislature enacted MCL 769.25 effective on March 4, 2014. The statute provides, in relevant part, as follows regarding the sentencing of select juvenile offenders:

(2)    The prosecuting attorney may file a motion under this section to sentence a defendant described in subsection (1) to imprisonment for life without the possibility of parole if the individual is or was convicted of any of the following violations:

***

(b)    A violation of section 16(5), 18(7), 316, 436(2)(e), or 543f of the Michigan penal code, 1931 PA 328, MCL 750.16, 750.18, 750.316, 750.436, and 750.543f.

(3)    If the prosecuting attorney intends to seek a sentence of imprisonment for life without the possibility of parole for a case described in subsection (1)(a), the prosecuting attorney shall file the motion within 21 days after the defendant is convicted of that violation. If the prosecuting attorney intends to seek a sentence of imprisonment for life without the possibility of parole for a case described under subsection (1)(b), the prosecuting attorney shall file the motion within 90 days after the effective date of the amendatory act that added this section. The motion shall specify the grounds on which the prosecuting attorney is requesting the court to impose a sentence of imprisonment for life without the possibility of parole.

(4)    If the prosecuting attorney does not file a motion under subsection (3) within the time periods provided for in that subsection, the court shall sentence the defendant to a term of years as provided in subsection (9).

***

(6)    If the prosecuting attorney files a motion under subsection (2), the court shall conduct a hearing on the motion as part of the sentencing process. At the hearing, the trial court shall consider the factors listed in [*Miller*, 132 S Ct 2455], and may consider any other criteria relevant to its decision, including the individual's record while incarcerated.

(7)    At the hearing under subsection (6), the court shall specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed. The court may consider evidence presented at trial together with any evidence presented at the sentencing hearing.

***

(9)    If the court decides not to sentence the individual to imprisonment for life without parole eligibility, the court shall sentence the individual to a term

of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years.

Therefore, pursuant to MCL 769.25, juveniles are no longer sentenced under the same fixed sentences as adults and, absent a motion by the prosecutor seeking a sentence of life without parole, "the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years." MCL 769.25(4) and (9). If the prosecutor files a motion seeking life imprisonment without the possibility of parole for the allowed enumerated offenses, the trial court must hold a hearing, at which it must consider the factors listed in *Miller* and shall specify on the record any reasons supporting the sentence imposed. MCL 769.25(6) and (7).

When considering *Eliason* and *Carp,* our Supreme Court determined that a sentencing court was not afforded with only the discretion to impose a penalty of life imprisonment without the possibility of parole or life imprisonment with the possibility of parole; a defendant whose case was on direct review at the time *Miller* was decided was entitled to resentencing pursuant to MCL 769.25(1)(b)(ii):

> Under MCL 769.25(9), the default sentence for a juvenile convicted of first-degree murder is a *sentence of a term of years* within specific limits rather than life without parole. A juvenile defendant will only face a life-without-parole sentence if the prosecutor files a motion seeking that sentence and the trial court concludes following an individualized sentencing hearing in accordance with *Miller* that such a sentence is appropriate. [*People v Carp,* 496 Mich 440, 528; 852 NW2d 801 (2014).]

In addition to the changes impacting juvenile sentences, our Supreme Court has recently declared certain features of Michigan's sentencing scheme unconstitutional. In *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), our Supreme Court concluded that "the rule from *Apprendi v New Jersey,* 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), as extended by *Alleyne v United States,* 570 US ——, 133 S Ct 2151, 186 L Ed 2d 314 (2013), applies to Michigan's sentencing guidelines and renders them constitutionally deficient. That deficiency is the extent to which the guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range, i.e. the 'mandatory minimum' sentence under *Alleyne.*" *Lockridge,* slip op, p 1-2. In order to remedy the constitutional deficiency, the Supreme Court severed "MCL 769.34(2) to the extent that it makes the sentencing guidelines range as scored on the basis of facts beyond those admitted by the defendant or found by the jury beyond a reasonable doubt mandatory." *Id.* The Court struck "the requirement in MCL 769.34(3) that a sentencing court that departs from the applicable guidelines range must articulate a substantial and compelling reason for that departure." *Id.* Going forward, the Supreme Court held that "a guidelines minimum sentence range calculated in violation of *Apprendi* and *Alleyne* is advisory only and that sentences that depart from that threshold are to be reviewed by appellate courts for reasonableness." *Id.*

This Court recently applied *Lockridge* to juvenile sentencing in *People v Skinner*, ___ Mich App ___; ___ NW2d ___ (Docket No. 317892, issued August 20, 2015), and held that a

jury must decide whether a juvenile is to be sentenced to life imprisonment without the possibility of parole because such a sentence increases the maximum penalty in violation of the Sixth Amendment. In finding that portions of MCL 769.25 violate the Sixth Amendment, this Court explained:

> MCL 769.25 contains provisions that establish a default term-of-years prison sentence for a juvenile convicted of first-degree murder. Specifically, the statute provides in pertinent part that "[t]he prosecuting attorney may file a motion under this section to sentence a[ ] [juvenile defendant] to imprisonment for life without the possibility of parole if the individual is or was convicted of [ ] [first-degree murder.]" MCL 769.25(2). Absent this motion, "the court *shall sentence the defendant to a term of years ....*" MCL 769.25(4) (emphasis added). The effect of this sentencing scheme clearly establishes a "default" term-of-years sentence for juvenile defendants convicted of first-degree murder. See *Carp*, 496 Mich. at 458 (explaining that "MCL 769.25 now establishes *a default sentencing range* for individuals who commit first-degree murder before turning 18 years of age" (emphasis added); MCL 769.25(4) (providing that, absent the prosecution's motion to impose a life without parole sentence, "*the court shall sentence the defendant to a term of years* as provided in subsection (9)" (emphasis added)). [*Skinner*, slip op, p 8 (footnotes omitted).]

Therefore, the *Skinner* Court concluded that: (1) MCL 769.25 makes an indeterminate term of years the default sentence for juveniles convicted of first-degree murder; (2) a court increases the default range if it sentences a juvenile to life in prison without parole; and, (3) the statute unconstitutionally requires the trial court to make factual findings in increasing the term of years. We disagree with the majority opinion in *Skinner* and would instead adopt Judge Sawyer's well-reasoned dissent.

In *Apprendi*, 530 US at 477; 120 S Ct 2348; 147 L Ed 2d 435 (2000), the United States Supreme Court reemphasized that the Sixth Amendment entitlement of a criminal defendant to a jury trial and the Due Process Clause in the Fourteenth Amendment "indisputably entitle a criminal defendant to a jury determination that [she] is guilty of every *element* of the crime with which [s]he is charged beyond a reasonable doubt." (Internal quotation and citation omitted). The Supreme Court summarized that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum" or prescribed sentence range, "must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. at 490. However, the Supreme Court additionally observed that "judges . . . have long exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case," including by "taking into consideration various factors relating both to offense and offender . . .." *Id*. at 481 (emphasis in original). MCL 769.25 does not violate *Apprendi* because the jury in this case decided each and every element of the crimes for which Hyatt was convicted. His sentence was not an enhancement, but was within the prescribed statutory maximum once the prosecutor filed a proper notice.

In *Ring v Arizona*, 536 US 584, 592; 122 S Ct 2428; 153 L Ed 2d 556 (2002) (Opinion by GINSBERG, J.[4]), an Arizona jury convicted the defendant of first-degree felony murder, for which the defendant faced a penalty of either life imprisonment or death.  The Court explained:

> Under Arizona law, Ring could not be sentenced to death, the statutory maximum penalty for first-degree murder, unless further findings were made. . . . [A] cross-referenced section . . . directs the judge who presided at trial to "conduct a separate sentencing hearing to determine the existence or nonexistence of [certain enumerated] circumstances . . . for the purpose of determining the sentence to be imposed."  The statute further instructs:  "The hearing shall be conducted before the court alone.  The court alone shall make all factual determinations required by this section or the constitution of the United States or this state."

> At the conclusion of the sentencing hearing, the judge is to determine the presence or absence of the enumerated "aggravating circumstances" [including having another conviction in the United States that carried a penalty of death or life imprisonment in Arizona, or a prior conviction "of a serious offense, whether preparatory or completed"; the defendant's conduct giving rise to the murder conviction "knowingly created a grave risk of death to another person or persons in addition to the person murdered during the . . . offense";  the defendant "procured the commission of the offense by payment, or promise of payment, or anything of pecuniary value; the defendant "committed the offense as consideration for the receipt, or in the expectation of pecuniary value"; the defendant "committed the offense in an especially heinous, cruel or depraved manner"; the defendant "committed the offense while in the custody of or on an authorized or unauthorized release from the state department of corrections, a law enforcement agency or a . . . jail"; the defendant had other homicide convictions that "were committed during the commission of the offense"; the defendant stood trial as an adult "and the murdered person was under fifteen years of age or was seventy years of age or older"; and the murder victim "was an on duty peace officer who was killed in the course of performing his official duties and the defendant knew, or should have known, that the murdered person was a peace officer"] and any "mitigating circumstances" [a nonexclusive list including "any factors proffered by the defendant or the state . . . relevant in determining whether to impose a sentence less than death"].  The State's law authorizes the judge to sentence the defendant to death only if there is at least one aggravating circumstance and "there are no mitigating circumstances sufficiently substantial to call for leniency." [*Id.* at 592-593 (citations omitted).]

---

[4] See *id.* at 610 (concurring opinion by SCALIA, J.), *id.* at 613 (concurring opinion by KENNEDY, J.).

The Supreme Court overruled a prior decision "to the extent that it allows a sentencing judge, sitting without a jury, to find an *aggravating circumstance* necessary for imposition of the death penalty." *Id*. at 609 (emphasis added). The Supreme Court concluded that "[b]ecause Arizona's enumerated *aggravating factors* operate as the functional equivalent of an *element* of a greater offender, the Sixth Amendment requires that they be found by a jury." *Id*. (internal quotation and citation omitted; emphasis added). Here, the sentencing court did not find any additional aggravating circumstances beyond what the jury found.

In *Cunningham v California*, 549 US 270, 274; 127 S Ct 856; 166 L Ed 2d 856 (2007), the United States Supreme Court held unconstitutional under the Sixth and Fourteenth Amendments a determinate sentencing law that "assign[ed] to the trial judge, not to the jury, authority to find the facts that expose a defendant to an elevated 'upper term' sentence," because the facts that the trial court found "are neither inherent in the jury's verdict nor embraced by the defendant's plea." The Supreme Court summarized:

> As this Court's decisions instruct, the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant. The relevant statutory maximum, this Court has clarified, is not the maximum sentence a judge after finding additional facts, but the maximum he may impose without any additional findings. In petitioner's case, the jury's verdict alone limited the permissible sentence to 12 years. Additional factfinding by the trial judge, however, yielded an upper term of 16 years. . . . We . . . reverse [the petitioner's sentence] because the four-year elevation based on judicial factfinding denied petitioner his right to a jury trial. [*Id*. at 274-275 (internal quotation, citation and emphasis omitted).]

The United States Supreme Court restated the relevant analysis from some of its recent decisions in this area:

> We have since reaffirmed the rule of *Apprendi*, applying it to facts subjecting a defendant to the death penalty, *Ring*, 536 US at 602, 609, facts permitting a sentence in excess of the "standard range" under Washington's Sentencing Reform Act, [*Blakely v Washington*, 542 US 296, 304–305; 124 S Ct 2531; 159 L Ed 2d 403 (2004)], and facts triggering a sentence range elevation under the then-mandatory Federal Sentencing Guidelines, [*United States v Booker*, 543 US 220, 243–244; 125 S Ct 738; 160 L Ed 2d 621 (2005)]. *Blakely* and *Booker* bear most closely on the question presented in this case.
>
> Ralph Howard Blakely was convicted of second-degree kidnapping with a firearm, a class B felony under Washington law. *Blakely*, 542 US at 298–299. While the overall statutory maximum for a class B felony was ten years, the State's Sentencing Reform Act (Reform Act) added an important qualification: If no facts beyond those reflected in the jury's verdict were found by the trial judge, a defendant could not receive a sentence above a "standard range" of 49 to 53 months. *Id*. at 299–300. The Reform Act permitted but did not require a judge to

exceed that standard range if she found "'substantial and compelling reasons justifying an exceptional sentence.'" *Id*. The Reform Act set out a nonexhaustive list of aggravating facts on which such a sentence elevation could be based. It also clarified that a fact taken into account in fixing the standard range—*i.e.*, any fact found by the jury—could under no circumstances count in the determination whether to impose an exceptional sentence. 542 US at 299–300. Blakely was sentenced to 90 months' imprisonment, more than three years above the standard range, based on the trial judge's finding that he had acted with deliberate cruelty. *Id*. at 300.

Applying the rule of *Apprendi*, this Court held Blakely's sentence unconstitutional. The State in *Blakely* had endeavored to distinguish *Apprendi* on the ground that "(u)nder the Washington guidelines, an exceptional sentence is within the court's discretion as a result of a guilty verdict." Brief for Respondent in *Blakely*, p 15. We rejected that argument. The judge could not have sentenced Blakely above the standard range without finding the additional fact of deliberate cruelty. Consequently, that fact was subject to the Sixth Amendment's jury-trial guarantee. 542 US at 304–314. It did not matter, we explained, that Blakely's sentence, though outside the standard range, was within the 10–year maximum for class B felonies:

"Our precedents make clear . . . that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant* . . . . In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' . . . and the judge exceeds his proper authority." *Id*. at 303-304, quoting 1 Bishop, Criminal Procedure § 87, p 55 (2d ed, 1872) (emphasis in original).

Because the judge in Blakely's case could not have imposed a sentence outside the standard range without finding an additional fact, the top of that range—53 months, and not 10 years—was the relevant statutory maximum. 542 US at 304.

*The State had additionally argued* in *Blakely* that *Apprendi*'s *rule was satisfied because* Washington's Reform Act *did not specify an exclusive catalog of potential facts on which a judge might base a departure from the standard range*. This Court rejected that argument as well. "*Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact . . . , one of several specified facts . . . or any aggravating fact (as here)*," we observed, "*it remains the case that the jury's verdict alone does not authorize the sentence*." 542 US at 305 (emphasis in original). Further, we held it irrelevant that the Reform Act ultimately left the decision whether or not to depart to the judge's discretion: "*Whether the judicially determined facts require a sentence*

*enhancement or merely allow it," we noted, "the verdict alone does not authorize the sentence." Id. n 8. [Cunningham, 549 US at 282-284 (original emphasis removed, current emphasis added).]*

Our statute does not run afoul of *Cunningham* because Hyatt did not receive an enhanced sentence. The sentencing court did not determine facts not already determined by the jury's verdict.

In *Alleyne,* 133 S Ct at 2155 (Opinion by THOMAS, J.[5]), the United States Supreme Court held that a sentencing court violated the Sixth Amendment and the principles outlined in *Apprendi*, 530 US 466, by finding any fact that *increased a mandatory minimum sentence*. The Supreme Court explained:

> Any fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an "element" that must be submitted to the jury. . . . [133 S Ct at 2155.]

The Supreme Court in *Alleyne* elaborated: (1) "*Apprendi* concluded that any facts that increase the prescribed range of penalties to which a criminal defendant is exposed are *elements* of the crime," and "the Sixth Amendment provides defendants with the right to have a jury find those facts beyond a reasonable doubt," *id*. at 2160; (2) "[i]t is indisputable that a fact triggering a mandatory minimum alters the prescribed range of sentences to which a criminal defendant is exposed," *id*.; and (3) because "facts increasing the legally prescribed floor [undisputedly] *aggravate* the punishment," "the core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury." *Id*. at 2161. Our statute does not run afoul of *Alleyne* because juveniles are not exposed to an increased penalty.

While our Supreme Court in *Carp* mentioned the term "default," the language of § 25(4) only divests the sentencing court of the discretion to impose a sentence other than the term of years "[i]f the prosecuting attorney does not file a motion under subsection (3) within the time periods provided for" in § 25(3). In a circumstance like this case, in which the prosecutor undisputedly timely filed a motion seeking the imposition of life in prison without parole under § 25(3), the remainder of MCL 769.25 neither expressly provides nor reasonably suggests that the sentencing court should apply any default sentence.

Moreover, unlike the sentencing statutes the United States Supreme Court ruled unconstitutional in *Apprendi*, *Ring*, *Blakely*, *Cunningham*, and *Alleyne*, nothing in MCL 769.25 premised the sentencing court's authority to impose a term of life imprisonment without parole

---

[5] In separate opinions, a majority of the justices concurred in Parts I, III-B, III-C, and IV of Justice Thomas's lead opinion. See concurring opinion by SOTOMAYOR, J., 133 S Ct at 2164-2166, and partial concurrence by BREYER, J., 133 S Ct at 2166-2167.

on any specific finding that Hyatt's jury failed to consider in convicting Hyatt of first-degree felony murder. Because the prosecutor undisputedly and properly filed a motion seeking a life-without-parole sentence for Hyatt, the term of years mandate in §§ 25(4) and (9) did not apply.

Finally, the plain language of the statute did not require the trial court to make any findings concerning aggravating or mitigating factors before the court could sentence Hyatt to life without parole. Consequently, the life without parole sentence in this case came within the statutory maximum, specifically "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Cunningham*, 549 US at 283-284, quoting *Blakely*, 542 US at 303-304.

At Hyatt's *Miller* hearing, Officer Terrence Green testified that, unlike the other defendants, Hyatt showed "no remorse, no concern" for what happened. Green acknowledged that the robbery was Perkins' idea and that the other defendants were older than Hyatt. Hyatt's school records revealed assaultive behavior and a threat to "put a cap" in a teacher, resulting in his suspension. A counselor had worried that Hyatt appeared to have no remorse or conscience.

Psychologist Karen Noelle testified that Hyatt had a below average IQ. She testified that Hyatt was a "seriously disturbed young man" with "serious maladjustment" who was "impressionable, easily led, frustrated," depressed and "caught in a morass of [] conflict." Hyatt reported that his mother, who was a lesbian, preferred "her women and alcohol" over her children. In contrast, Hyatt's father was a "very solid role model" for Hyatt. But Hyatt's father had been shot by intruders and was paralyzed from the chest down. Hyatt believed his father blamed him for the incident and Hyatt also blamed himself. After his father went to a VA hospital in Texas, Hyatt lived with his mother and other family members, though he considered himself homeless.

Noelle believed Hyatt had the intellectual capacity to be rehabilitated. She was "not sure" whether Hyatt was capable of remorse before the incident occurred because he clearly failed to appreciate the consequences of his prior actions. Hyatt was immature and irresponsible. Noelle testified: "I don't know that he has no sense of remorse and no conscience at all. . . . I do feel that he is not a sensitive, compassionate young man. I do feel that he's pretty disconnected from societal morals and mores. I think that's concerning, yes I do." Noelle testified that she could not predict whether Hyatt was going to change. It would "require extreme effort and dedication on his part." But she could not say that he was "irredeemable." "[I]f I were to predict in five years, it would not be possible."

The sentencing court took the *Miller* factors into consideration at sentencing and concluded "I don't think any factor that I've considered has anything to do with his age." Hyatt's criminal acts were not the result of "impetuosity or recklessness." After extensively reviewing the evidence before it, the sentencing court concluded that "[i]n considering all of that and the nature of the crime itself and the defendant's level of participation as the actual shooter in this case, the principle of proportionality requires this Court to sentence him to life in the State prison without parole." Were it not for *Skinner*, we would affirm the sentencing court's decision

to sentence Hyatt to life imprisonment without the possibility of parole.[6] Instead we are compelled to remand for sentencing consistent with *Skinner*.

## V. CONCLUSION

In Docket No. 323454, we affirm Perkins' convictions and sentences, but remand for the ministerial task of correcting Perkins' judgment of sentence to reflect that his felony-firearm sentence does not run consecutively to his conspiracy to commit armed robbery sentence.

In Docket No. 323876, we affirm Williams' convictions and sentences.

In Docket No. 325741, we affirm Hyatt's convictions, but remand for resentencing so that a jury may determine whether Hyatt should receive a sentence of life in prison without the possibility of parole.

We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ Michael J. Talbot
/s/ Mark J. Cavanagh

---

[6] We emphasize that while MCR 7.215(J)(2) requires us to declare a conflict, the defendant in *Skinner* has filed an application for leave to appeal with our Supreme Court in Docket No. 152448.