*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 6, 2021

Plaintiff-Appellee,

v

No. 350716
Berrien Circuit Court
LC No. 2019-000187-FC

DAYSHUN TYWONE SPEARS,

Defendant-Appellant.

Before: SHAPIRO, P.J., and CAVANAGH and REDFORD, JJ.

PER CURIAM.

Defendant, Dayshun Tywone Spears, appeals by right his convictions by a jury of assault with intent to murder (AWIM), MCL 750.83; and felony-firearm, MCL 750.227b. The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to serve 20 to 50 years' imprisonment for AWIM consecutively to two years' mandatory imprisonment for felony-firearm. For the reasons stated in this opinion, we affirm defendant's convictions but remand for resentencing.

## I. FACTUAL BACKGROUND

This appeal arises from events that took place during a party on January 1, 2019, at a private residence that was attended by over 100 people. The victim arrived at the party after 4:00 a.m., drank two pints of tequila and a mixed cocktail, had an altercation with an individual, and then walked to the side of the house to urinate. Two individuals followed him from a distance and one of them shot the victim in the leg and chest. The victim fled behind and around to the other side of the house and collapsed. A police officer who had been monitoring the party heard the shots and eventually located the victim who appeared unconscious and not breathing. The police officer performed CPR reviving him until paramedics arrived and took the victim to the hospital. The physician who attended to the victim described the injuries as life-threatening.

Two surveillance videos taken from two angles from the house next door recorded the events including the altercation and the shooting. Police officers who were at the scene wearing body cameras and police vehicles at the scene with dashcams also captured video footage of the party scene. After the incident, police received a tip through the "Crime Stoppers" anonymous

-1-

system, including a photograph of defendant and two other individuals that had been taken earlier the evening of the shooting. Additional photos were obtained by the police through social media. The photos depicted defendant wearing distinctively identifiable white pants with dark stripes down each side, a dark jacket under which he wore a white hooded sweatshirt, a cap, and black shoes with white Nike logos on the sides and white banding around the bottom sections near the soles. In addition to the defendant, the photos also depicted Isaiah Thomas and Delonte Carter. As part of the police investigation, Detective Tyler Roots analyzed the photographs, the surveillance video footage, and the police bodycam and dashcam videos.

Before trial, defendant moved to "preclude witness testimony as to the identity of the individual(s) in any surveillance, or police, or any other video." Defendant argued that the police officer who would testify as a lay witness, would not be able to positively identify the persons shown in the video, and therefore, the matter should be left for the jury to decide. The prosecution responded that this identification testimony should be allowed to the extent admissible under MRE 701 which permits lay witness opinion testimony. At a status conference held before the trial began, the trial court granted defendant's motion to exclude specific identification testimony as follows:

> I'm not gonna allow Detective Harmon[1] or Detective Root [sic] to testify based upon what they've testified here, that the—the individual in that video is the defendant.

> What I will let them testify to, because they have had extensive opportunities to review the video, and numerous times, and look at the—the photograph and the [sic] Detective Harmon has had an opportunity to have contact with the defendant in the past, I will allow him to identify the defendant in the photograph 'cause he's able to do that, Detective Root, [sic] I don't think so. But Detective Harmon, I will allow him to testify, as I said, because there's past experience.

> Now, with respect to the clothing, I will allow both of them—both detectives who's [sic] reviewed the video extensively, as well as watched all of it, according to what I believe Detective Roots said, to be able to testify that, in the video and watching, whether or not he observed anybody else besides the shooter with white pants and a black stripe on it and black shoes and what—black and white shoes, and this white hoodie underneath this other jacket, I will allow them to testify as to the similarity of those clothing, from the shooting to the picture, to the individual who was walking in front of the video camera on the car. And I—I think that, that's, permissible.

> Whether or not the jury views that as sufficient to ultimately conclude therefore that he's, in fact, this defendant, is for the jury to decide if that's enough.

---

[1] Detective Harmon testified at trial. However, his testimony did not include any discussion of photographic or video evidence.

At trial, the victim testified that he had an altercation with a person he knew by the name Isaiah. The prosecution showed the victim two photographs and he identified Isaiah in them and also identified defendant, whom he knew and called by the nickname "Savage." He explained that "Savage's" real name was Dayshun Spears and identified him as the defendant in the courtroom.

The victim testified that when he went to the side of the house to urinate he was shot and the muzzle flash from the gun prevented him from seeing who shot him. He testified, however, that he had seen videos which enabled him to know who shot him. The prosecution played the surveillance videos depicting two different camera angles of the incident for the jury and the victim to view. The victim identified himself as the person in the footage walking to the side of the house and urinating when shots were fired by a shooter depicted in the footage from the other camera angle. When asked who shot him, the victim stated "Savage." The victim also identified Isaiah in the video footage as the person standing behind "Savage" when the shooting occurred and affirmed that Isaiah had been the person with whom he had the altercation. The victim then identified "Savage" in additional portions of the surveillance video footage.

During cross-examination the victim testified that he saw defendant at the party inside the house wearing distinctive white pants before the shooting. The victim admitted that he did not see defendant outside when his altercation with Isaiah occurred. The victim admitted that he told investigating officers different conflicting statements about what happened. Nevertheless, the victim affirmed his testimony that "Savage" shot him.

The victim also explained that an acquaintance visited him at the hospital and showed him photographs in which he recognized "Savage." The victim testified that once he saw the surveillance video at a later date he knew for sure that "Savage" shot him.

The prosecution called Detective Roots to testify and he explained that he received a "Crime Stoppers" tip that included a photograph that assisted in his investigation and later led him to suspect defendant of being the shooter. The prosecution questioned him extensively about the photo. He explained that the photo depicted defendant with Isaiah and Carter. Detective Roots testified that additional photos were obtained through social media, one of which depicted defendant and Isaiah, and one of defendant alone. All three photos were taken the night of the shooting at a different party venue. Detective Roots testified regarding defendant's clothing depicted in the photographs and described the visibly distinctive features.

Detective Roots also testified regarding obtaining the surveillance videos from the house next door to the shooting location. He explained that he viewed the video footage in excess of 50 times. The prosecution played the surveillance videos and Detective Roots testified regarding what he saw in the video and compared the clothing worn by the individuals in the video to the clothing worn by the individuals in the photographs. Detective Roots explained that the attire worn by one person in the video footage seemed consistent with the clothing worn by defendant in one of the photos obtained from social media. Replay of the surveillance video resumed and Detective Roots described the action sequence leading up to and including the shooting. He compared the photo obtained via the "Crime Stoppers" tip with the video footage and described defendant's clothing in specific detail.

The prosecution then asked what individuals could be seen in the video footage around the time of the shooting to which Detective Roots responded, "You can see all three of 'em." That prompted defense counsel to request to approach the bench. In the discussion that followed outside of the hearing of the jury, defense counsel explained that he thought the trial court had ruled that Detective Roots could not identify defendant in the surveillance video. The trial court recessed and sent the jury out. The trial court then discussed the matter with the parties. Defense counsel explained that Detective Roots identified the three individuals in the photograph but then "said, without quite saying the words, these are the guys in the video." Defense counsel stated that he had no objection to the testimony that linked the individuals in the photo to those in the video but objected to Detective Roots's last statement and requested a mistrial. The prosecution pointed out that the victim testified earlier and identified defendant in the video. The prosecution offered to clarify the testimony and suggested that the court could give the jury a curative instruction. Further discussion occurred and the trial court denied defendant's motion for mistrial but directed the prosecution to elicit testimony from the witness clarifying that his testimony referred to clothing comparison alone. The trial court agreed to provide the jury a curative instruction.

When the jury returned, the prosecution inquired further of Detective Roots who testified that he could not see anyone's face in the video nor could he identify anyone in the video. Detective Roots then focused on comparing the clothing worn by the individuals in the photograph with the clothing worn by individuals in the surveillance video footage and several still images reproduced from that video footage. He described the clothing worn by the person identified as the shooter but admitted that he could not discern the faces of anyone in the surveillance videos. He testified further that he had watched all of the available video footage and estimated that he reviewed the surveillance tapes around 50 times. At the conclusion of the direct examination of Detective Roots, the trial court gave the following curative instruction:

> Ladies and gentlemen, I just wanna make one thing clear to you in terms of the detective's testimony in this case, because at some point during his testimony, he referred to individuals in that video as Dayshun Spears, Delonte Carter, and Isaiah Thomas. Now, the detective is not testifying that those are those individuals because it's not that clear to make an ID. What he's testifying to, is that the clothing worn by the individuals in the video is similar to the clothing worn by the individuals that are known in that photograph that was admitted. Just so it's clear, he—he is not testifying as to the identity of those individuals; to do so, actually, even if he could, would be to invade the province of the jury. It's for you to decide whether or not those three individuals are the individuals in the similar clothing as the three in the photograph.

Defense counsel cross-examined Detective Roots during which he reiterated that he could not identify any faces in the surveillance videos but could identify specific clothing worn by individuals featured in the videos including the shooter before and after the shooting. Detective Roots agreed that the victim had provided different conflicting versions of events in his interviews with police. The People rested and defendant called no witnesses. The trial court instructed the juror regarding their duties including repeatedly that they were the sole determiners of the facts in this case. The jury deliberated for a period, requested and was granted the opportunity to view all of the videos in the order of their presentation during trial, then retired to deliberate further. Shortly thereafter the jury entered its verdict finding defendant guilty as charged.

## II. MOTION FOR MISTRIAL

Defendant argues that the trial court erred by denying defendant's motion for a mistrial because Detective Roots identified defendant in surveillance video footage as the shooter which improperly invaded the province of the jury. We disagree.

"The denial of a motion for a mistrial is reviewed for an abuse of discretion." *People v Alter*, 255 Mich App 194, 205; 659 NW2d 667 (2003) (citation omitted). A trial court abuses its discretion when it chooses an outcome that falls outside the range of principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). In *People v Gonzales*, 193 Mich App 263, 265; 483 NW2d 458 (1992) (quotation marks and citation omitted), a case that involved a witness who made an unsolicited outburst that alerted the jury to inadmissible evidence of a prior conviction, this Court articulated the standard for determining when a mistrial is appropriate:

> It is well settled that the grant or denial of a mistrial is within the sound discretion of the trial court, and there must be a showing of prejudice to the defendant's rights if error requiring reversal is claimed. The trial court's ruling must be so grossly in error as to deprive a defendant of a fair trial or to amount to a miscarriage of justice.

This Court clarified that a "mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *Id*.

In this case, Detective Roots offered lay opinion regarding the comparison of clothing worn by the individuals in the photographs, the surveillance video footage, and dashcam video footage as permitted under MRE 701 which provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Under MRE 704, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

In *People v Fomby*, 300 Mich App 46; 831 NW2d 887 (2013), a police officer provided a narrative description of a surveillance video and identified individuals depicted in still photographs taken from the surveillance video as the same individuals in the actual video. The officer, however, did not testify that any of the individuals depicted in either the still photographs or the video was the defendant. *Id*. at 49. On appeal, the defendant argued that because his identity was at issue, the officer's testimony invaded the province of the jury. *Id*. at 48. This Court held that the testimony "was properly admitted as lay opinion testimony under MRE 701." *Id*. at 50. This Court explained that the testimony was "rationally based on [the officer's] perception" of the video because he had watched the video multiple times and had used it to produce the still images. *Id*. at 50-51. This Court stated that the officer's testimony was "intended to provide a clearer understanding" of whether the suspects had visited the scene before the crime and that the officer reached his conclusions only after scrutinizing the entire nearly six-hour long video several times.

*Id*. at 51-52. This Court further stated that "it can similarly be reasonably inferred that [the officer's] testimony helped the jury to correctly and efficiently determine whether the two individuals seen earlier in the footage were the same individuals who were involved in the murder later depicted in the video." *Id*. at 52. This Court recognized, however, that when a witness is in no better position than the jury to make an identification from a video or photograph, opinion testimony identifying a person in a video or photograph as the defendant is generally inadmissible as infringing on the jury's role in deciding the defendant's guilt. *Id*. But, because the officer only testified that the individuals in the video and still photos were the same persons and did not identify the defendant as the person in the video and still images, the officer's testimony was not inadmissible. *Id*. at 53.

In *People v Perkins*, 314 Mich App 140, 161-162; 885 NW2d 900 (2016), this Court determined that the testimony of a witness based solely on his review of security camera footage "invaded the province of the jury" because no reason existed to believe that the witness more likely could correctly identify the person than the jury. This Court noted that nothing about the images necessitated the witness's opinion. *Id*. at 162. This Court distinguished the officer's testimony from "the witness in *Fomby* who testified that the individual in the video footage was the same individual in still images but did not specifically identify the defendant as the individual in the images . . . ." *Id*. This Court explained:

> [The officer] could properly comment that, based on his experience, the individual appeared to be concealing a weapon, but [the officer] should not have been allowed to identify [the defendant] as that individual. "[W]here a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." There was nothing about the images (i.e. poor quality of the images, defendant wearing a disguise) that necessitated [the officer]'s opinion. This is evidenced by the trial court's own statement during defense counsel's objection that "I would have no trouble making an identification myself." [*Id*. at 161-162 (citation omitted).]

Nevertheless, because the evidence of the defendant's guilt was "overwhelming" and his identity was not in dispute, this Court held that the error was "ultimately of no consequence." *Id*. at 162-163.

Analysis of the record in this case indicates that it is unlike *Fomby* and similar to *Perkins*. Although not entirely clear from the transcript, it appears that Detective Roots strayed slightly from comparing the clothing worn by individuals in the photographs and the video footage to testify that the three individuals depicted in the photos were visible in the video. Although Detective Roots did not specifically identify defendant as the shooter, his remark that he could see all three individuals in the video footage went too far. Therefore, we agree that Detective Roots's testimony identifying defendant as one of the persons depicted in the video impermissibly invaded the province of the jury. MRE 701; *Fomby*, 300 Mich App at 53. As this Court stated in *Fomby*, "the issue of whether the defendant in the courtroom was the person pictured in a surveillance photo [is] a determination properly left to the jury." *Id*. at 52. The record does not indicate that Detective Roots held any better position than the jury to make the identification. *Id*. at 52-53.

Nevertheless, we are not persuaded that the trial court's denial of defendant's motion for a mistrial deprived defendant of a fair trial or resulted in a miscarriage of justice. Although Detective Roots stated that the three individuals were visible in the video, he only did so after the victim testified repeatedly that he identified defendant as the person who shot him from recognizing defendant in the same video footage. The victim indicated that he recognized "Savage" as the shooter and identified him in the courtroom as defendant. The victim also testified regarding the clothing defendant wore on the night of the shooting which he saw inside the house just before the altercation with Isaiah and the shooting that ensued. After viewing the surveillance video in the presence of the jury, the victim unequivocally identified defendant as the individual who shot him. The victim also identified defendant in the photos at trial. Unlike Detective Roots, the victim was in a better position than the jury to identify defendant in the surveillance video because he knew defendant, observed defendant at the party and noticed his distinctive clothing, and obviously was present during the shooting. Given these circumstances, we conclude that Detective Roots's statement, although improper, did not substantially affect the outcome of the proceedings or deprive defendant of a fair trial.

Moreover, the trial court directed the prosecution to clarify the scope of Detective Roots's testimony and on further direct examination and during cross-examination Detective Roots admitted that he could not see any faces in the surveillance video nor identify the individuals depicted in the video. Further, the trial court also instructed the jurors that they alone would decide whether or not the three individuals in the photographs were the same persons captured in the video footage. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). We are not persuaded that the jury lacked the ability to follow the trial court's instructions in this case. In this particular case, the trial court did not abuse its discretion in finding that the extreme measure of declaring a mistrial was not required. *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel provided ineffective assistance by conceding that a detective could testify as to the similarity between the clothing worn by defendant in a photograph and the clothing worn by the shooter in the surveillance footage. We disagree.

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012) (citation omitted). "Because defendant did not move for a hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), this Court's review is limited to errors apparent on the record." *People v Knapp*, 244 Mich App 361; 624 NW2d 227 (2001).

"In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51 (citations omitted). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id*. at 52 (citation omitted). "In

addition to proving that defense counsel's representation was constitutionally deficient, defendant must show that but for counsel's deficient performance, a different result would have been reasonably probable." *Id*. at 55-56.

Defense counsel's performance did not fall below an objective standard of reasonableness by not objecting to testimony about the similarity of clothing. The statements regarding the clothing were admissible under MRE 701 as lay opinion testimony. This testimony is analogous to the testimony allowed in *Fomby* which did not invade the province of the jury. See *Fomby*, 300 Mich App at 53. Because the trial court, in its pretrial ruling, had already ruled this evidence admissible, little, if any, likelihood of success in objecting to the evidence at trial existed. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) (citation omitted). Therefore, defense counsel's failure to object at trial did not fall below an objective standard of reasonableness.

Further, defense counsel's failure to object to the clothing comparison did not prejudice defendant's case. Evidence of similarity in clothing constituted only one item of evidence that the jury had to consider. The jury heard the victim's testimony in which he identified defendant as the shooter and it also reviewed the photographs and surveillance video from which it made its own conclusions. The record reflects that defense counsel implemented a strategy regarding the clothing comparison and elicited testimony from witnesses that, in a party attended by over 100 people, a high likelihood existed that others present had similar clothing and appearance. In furtherance of that strategy, defense counsel elicited testimony that the police did not attempt to consider other possible suspects, interview possible witnesses, search the inside of the house, or prevent people from leaving the scene. From such evidence defense counsel essentially argued that defendant was the victim of mistaken identity and that the jury could not find defendant guilty beyond a reasonable doubt. The record reflects that defense counsel presented a reasonable trial strategy. Defense counsel has great latitude in matters of trial strategy, and this Court cannot second-guess defense counsel's strategy with the benefit of hindsight. See *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020). Defendant has not shown that his counsel's performance prejudiced his defense. Because defense counsel's performance did not fall below an objective standard of reasonableness nor prejudiced him, defendant's ineffective assistance argument lacks merit.

IV. OV 13

Defendant argues that the trial court erred by assessing 25 points for Offense Variable (OV) 13 because some of the offenses listed in the Presentence Investigation Report (PSIR), which were charged but later dismissed could not be used to score OV 13 and he contends that he is entitled to resentencing. We agree.

The proper interpretation and application of the statutory sentencing guidelines are legal questions that are reviewed de novo. *People v Francisco*, 474 Mich 82, 85; 711 NW2d 44 (2006). "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory

interpretation, which an appellate court reviews de novo." *Id*. "Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015) (quotation marks and citation omitted).

In *Francisco*, 474 Mich at 89-92, our Supreme Court held that the defendant was entitled to resentencing when the trial court erred in scoring the sentencing guidelines even though the original sentence fell within the appropriate, re-scored guidelines range. The Court remanded that case for resentencing because an appellate court cannot know whether the trial court would have imposed the same sentence if the guidelines had been accurately scored. *Id*. The Court reasoned, "requiring resentencing in such circumstances not only respects the defendant's right to be sentenced on the basis of the law, but it also respects the trial court's interest in having defendant serve the sentence that it truly intends." *Id*. at 92.

OV 13 is scored to account for a continuing pattern of criminal behavior. MCL 777.43 provides in relevant part:

> (1) Offense variable 13 is continuing pattern of criminal behavior. Score offense variable 13 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> * * *
>
> (c) The offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person................................................................25 points
>
> * * *
>
> (2) All of the following apply to scoring offense variable 13:
>
> (a) For determining the appropriate points under this variable, all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction.

"A judge is entitled to rely on the information in the [PSIR], which is presumed to be accurate unless the defendant effectively challenges the accuracy of the factual information." *People v Grant*, 455 Mich 221, 233; 565 NW2d 389 (1997). In *McChester*, 310 Mich App at 358, this Court explained that, when "calculating the sentencing guidelines, a court may consider all record evidence, including the contents of PSIR, plea admissions, and testimony presented at a preliminary examination."

In *Francisco*, our Supreme Court clarified that the five-year time period specified in MCL 777.43(2)(a) must include the sentencing offense. *Francisco*, 474 Mich at 86-87. "MCL 777.43(2)(a) defines a 'pattern' as three or more crimes committed 'within a five-year period, *including the sentencing offense* . . . .' " *Id*. at 86 (ellipsis in original).

In this case, the sentencing offense occurred on January 1, 2019. Counting backward five years, all felony offenses occurring between January 1, 2014 and January 1, 2019 must be counted.

The sentencing offense counts as one of the three offenses, so two additional offenses during this five-year period were required to establish a pattern to permit assessment of 25 points for OV 13. See MCL 777.43(2)(a). Defendant's PSIR indicates that during the five years preceding the charged offense, defendant was arrested multiple times for crimes against persons, not including the charged offense. Defendant was arrested during 2014 twice for misdemeanor domestic violence to which he entered pleas and received some jail time. Because they were misdemeanors and not felonies, the trial court could not consider them for OV 13 scoring purposes. The PSIR also indicates that defendant was arrested in September 2014 for domestic violence, in August 2015 for assault with a dangerous weapon, in March 2016 for "Assault or Assault & Battery," and third offense domestic violence in December 2018. None of these charges, however, were prosecuted and they all resulted in entries of *nolle prosequi*. The PSIR also indicates two other cases in which defendant had been charged with third offense domestic violence, but those charges were dismissed. The PSIR does not indicate that defendant was charged and prosecuted for two felonies in addition to the charged offense of which the jury convicted him in this case. The lower court record does not indicate any discussion of the reason for no prosecution of these charged offenses nor any of the underlying facts for the original charging of defendant. A preponderance of evidence in the record, therefore, does not support the trial court's assessment of 25 points for OV 13 in this case.

Correction of the guidelines scoring, i.e., subtraction of the 25 points from the 106 total OV points results in 81 points. Under the sentencing guidelines Class A offense grid, defendant's minimum sentence range when correctly calculated changes from 135 to 281 months to 126 to 262 months for defendant's Class A offense of AWIM. The transcript of the sentencing hearing and defendant's judgment of sentence reflect that the trial court sentenced defendant to a minimum sentence of 240 months' imprisonment. Under *Francisco*, 474 Mich at 91-92, although defendant's minimum sentence falls within the recalculated guidelines, defendant, nevertheless, is entitled to resentencing.

We affirm defendant's convictions and the trial court's denial of defendant's motion for a mistrial, but remand this case for resentencing. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ James Robert Redford

-10-