*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

NICHOLAS RAAD BAHRI,

        Defendant-Appellant.

UNPUBLISHED
June 27, 2024

No. 362130
Macomb Circuit Court
LC No. 2021-002220-FC

Before: YATES, P.J., and BORRELLO and GARRETT, JJ.

PER CURIAM.

In late September 2020, defendant, Nicholas Raad Bahri, shot and killed a family, including defendant's friend, Tukoyo Moore (Tukoyo), Tukoyo's young son, Tai'Raz Moore (Tai'Raz), and Tukoyo's fiancée, Isis Rimson, at two separate locations. Defendant was convicted by a jury on three counts of first-degree premeditated murder, MCL 750.316(1)(a); three counts of first-degree felony murder, MCL 750.316(1)(b); fourth-degree arson, MCL 750.75; felon in possession of a firearm, MCL 750.224f; mutilation of a dead body, MCL 750.160; and six counts of possession of a firearm during the commission of a felony, MCL 750.227b. The trial court sentenced defendant to serve life imprisonment without parole for the first-degree murder convictions, 38 to 60 months in prison for the arson and felon-in-possession convictions, and 38 to 120 months' imprisonment for the mutilation conviction, as well as two-year terms of imprisonment for all the felony-firearm convictions to be served consecutively to the other sentences. On appeal, defendant offers several challenges to his convictions, but not his sentences. We affirm.

## I. FACTUAL BACKGROUND

In the evening hours on September 30, 2020, defendant shot and killed Tukoyo even though Tukoyo was defendant's friend and they frequently spoke by phone. Indeed, approximately 300 calls between the two occurred in the three months leading up to the killings. The evidence about Tukoyo's conduct in the days leading up to the murders suggests he was part of a drug-trafficking operation. Before the killings, Tukoyo rented a Kia Sorrento. At approximately 7:15 p.m. on the night of September 30, 2020, Tukoyo left his home in the rental car and drove to

-1-

defendant's home, arriving at 7:48 p.m. At that point, Tukoyo's phone stopped transmitting, meaning it was turned off.

Video footage obtained from a surveillance camera in the driveway of defendant's home showed defendant walking to the rental car, briefly speaking with Tukoyo, and putting a satchel in the rear of the car. After making several trips between the vehicle and the garage, defendant could be seen putting his hand in his right pants pocket and then sitting in the vehicle. After some visible movement of defendant's hand and Tukoyo's head, the vehicle began backing down the driveway. At trial, a police officer opined that that movement was the moment that defendant shot Tukoyo. Some shrubbery blocked the view of the car when it reached the bottom of the driveway. But the vehicle left the scene within 15 seconds of making its way to the end of the driveway.

GPS data revealed that the rental car left defendant's home at 7:55 p.m. After leaving the house, the car left defendant's neighborhood, drove through other neighborhoods and into cul-de-sacs, entered and exited various freeways throughout the greater Detroit area, and eventually ended up at Tukoyo's home in Warren at about 9:47 p.m. The car stopped at the home just briefly before turning around and leaving. The car then traveled to a nearby street, turned around, and made its way back to Tukoyo's home at 9:55 p.m., staying there for over an hour.

After leaving Tukoyo's home at 11:10 p.m., the rental car went to a gas station in Ferndale. While the car was on the way to the gas station, a burner phone defendant had purchased several days earlier attempted to make a call. That call did not go through, but the phone used a cell-phone tower that was near the location of the rental car at the time. The unsuccessful call was made to a number associated with a person who was a known contact on defendant's iPhone.

Video surveillance from that gas station showed a person enter the store of the gas station. According to the gas station attendant, that person acted very nervously and purchased a gas can, cigarettes, and some gasoline. The person said he was "on a mission" and asked if the gas station had any gloves for sale, which it did not.

After leaving the gas station, the rental car took an erratic path to its final destination on Hyde Park Drive in Detroit. Surveillance video revealed a person resembling defendant walking in the Greektown area near Hyde Park Drive. That person was wearing clothing—including a University of Michigan hat—similar to what the person in the gas station surveillance video was wearing. While in the Greektown area, the person was captured on surveillance video putting the hat in a garbage can and, later, getting into a cab. Security footage at defendant's home showed defendant arriving home in a cab at approximately 3:45 a.m.

In the early morning hours of October 1, 2020, the police responded to a report of a burning car on Hyde Park Drive. When the police arrived at the scene, firefighters were extinguishing the fire and notified the police that there was a body, later identified as Tukoyo, in the back of the car. An arson investigator determined that the fire was intentionally set and that gasoline was used as the accelerant. A gas can was found in the vehicle on top of Tukoyo's body.

An autopsy revealed that Tukoyo's death was caused by a gunshot wound to the head with an entrance wound at the right earlobe, which penetrated his head and severed his spinal cord. The medical examiner noted stippling on Tukoyo's right cheek and neck, which indicated that the gun

was fairly close to him when it was discharged.  The medical examiner did not think it would have been possible for Tukoyo to have driven a vehicle anywhere after being shot.

When the police went to Tukoyo's home in Warren to notify his next of kin about his death, they noticed that the front door was ajar.  They contacted the Warren Police Department to conduct a welfare check.  Warren police officers entered the home, which appeared to be ransacked, with many items strewn about the home.  In the basement, the police found Rimson and Tai'Raz dead. Rimson was in a crouched, defensive position, curled up, while Tai'Raz was found with his knees pulled up to his chest.  There were shell casings near them, bullet holes in the walls, and pools of blood.  Two different types of shell casings were recovered: .45-caliber and .380-caliber.

Rimson had eight separate gunshot wounds, including one to the left side of her head that was determined to be particularly lethal.  Rimson also had a wound on her right forearm that was characteristic of occurring while in a defensive posture, and a laceration on the left side of her chin that was consistent with being hit with a gun.  Tai'Raz had seven gunshot wounds.  One gunshot entered Tai'Raz's left temporal area, perforated the brain, and was "immediately incapacitating and rapidly fatal."

During the criminal investigation, the officer in charge, Detective Jim Twardesky, sought the assistance of the Michigan State Police (MSP) in enhancing the driveway video that showed defendant and Tukoyo leaving on the evening of September 30, 2020.  Sergeant Kevin Curtis from the MSP was able to zoom in on a portion of that video and enhance it.  When the video was played at trial, Detective Twardesky explained that while watching the regular version of the video many times, he thought he was seeing defendant put his hand up and shooting Tukoyo in the head.  He opined that this was consistent with his understanding of the medical examiner's autopsy report, i.e., that Tukoyo had been shot in the right temporal area at close range.

At trial, the prosecution presented evidence of defendant's Internet search history from his phone.  In the days leading up to the offenses, defendant accessed the website gunauction.com and placed a bid on a handgun.  He also searched for .380-caliber and .45-caliber ammunition.  Beyond that, there was a search at approximately 5:00 a.m. on October 1 for "body found in Detroit."

Defendant was charged with both first-degree premeditated murder and first-degree felony murder for killing Tukoyo, Rimson, and Tai'Raz.  The felonies that supported the felony-murder charges were carjacking for Tukoyo's death and armed robbery for Rimson and Tai'Raz.  The jury convicted defendant on all counts as charged, and this appeal followed.

## II.  LEGAL ANALYSIS

Through counsel, defendant presents several challenges to his convictions.  First, defendant claims the trial court erred when it permitted a police officer to offer his interpretation about what was depicted in a video played for the jury.  Alternatively, defendant contends that his trial counsel was ineffective when he failed to cite any rule of evidence in his objection to that testimony.  Next, defendant argues that he received ineffective assistance of counsel when his defense counsel failed to move to suppress the evidence seized from defendant's cell phone.  Defendant also asserts that his defense counsel performed ineffectively by failing to object to the admission of several graphic and duplicative photos of the victims' bodies.  Additionally, defendant contends that his right to a

unanimous verdict was violated when the jury was instructed by both the trial court and the verdict form that "it could convict [defendant] of first-degree premeditated murder and/or felony murder without being unanimous as to which crime he committed." Alternatively, defendant alleges that his trial attorney was ineffective for failing to object to that instruction.

In a Standard 4 brief, defendant presents an array of arguments that focus on the allegation that a video presented to the jury at trial was altered, and that his attorney was ineffective for failing to procure the testimony of an expert witness. We will address each argument in turn.

## A. WITNESS TESTIMONY REGARDING VIDEO EVIDENCE

Defendant asserts that the trial court erred when it allowed Detective Twardesky to provide his opinions about what the surveillance video taken at the driveway of defendant's home depicted. Specifically, defendant claims it was improper for Detective Twardesky to testify that defendant was the man who appeared in the video, that defendant was armed in the video, and that the video showed defendant shooting Tukoyo in the head. Defendant claims this testimony was inadmissible because it invaded the province of the jury "by embracing an ultimate issue that the jury was fully competent to determine." Alternatively, defendant argues that defense counsel was ineffective for failing to adequately object to this testimony. Additionally, defendant contends that, to the extent Detective Twardesky's opinion was based on his training and experience as a police officer, it was improper for him to give that opinion testimony without being qualified as an expert.

A trial court's evidentiary rulings are reviewed for an abuse of discretion. *People v Fomby*, 300 Mich App 46, 48; 831 NW2d 887 (2013). An abuse of discretion occurs if the court "chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id*. According to MRE 701,[1] which governs the admission of lay opinion testimony:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

This Court applied MRE 701 to a police officer's testimony about video footage that was played for the jury in *Fomby*, 300 Mich App at 50. Analyzing whether the testimony was rationally based on the witness's perception, this Court noted that the witness had undertaken an "extensive review" of the video, which allowed for the inference that the witness had viewed the video "several times in order to draw his conclusions and opinions . . . ." *Id*. at 51. In analyzing whether the testimony was helpful to a clear understanding about what the video depicted, relevant considerations include the length of the video and the number of events occurring simultaneously in the video. *Id*. at 51-52.

---

[1] The Michigan Rules of Evidence were substantially amended in September 2023, and all those amendments went into effect on January 1, 2024. In this opinion, we shall rely on the version of the rules of evidence in effect at the time this matter was decided.

Even if the testimony is admissible under MRE 701, it is still inadmissible if it invades the province of the jury. *Id*. at 53. A lay opinion about video evidence does not invade the province of the jury if the witness is in a better position to see what the video depicted. *Id*. at 52. Conversely, if "a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." *People v Perkins*, 314 Mich App 140, 161-162; 885 NW2d 900 (2016). "[P]oor quality of the images" is a factor to consider when analyzing whether witness testimony about a video invaded the province of the jury. *Perkins*, 314 Mich App at 162. In addition, "[a] witness cannot express an opinion on the defendant's guilt or innocence of the charged offense . . . ." *Fomby*, 300 Mich App at 53. But "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." MRE 704.

Here, Detective Twardesky gave his opinion about what was depicted in the surveillance video of defendant's driveway. Specifically, he testified that defendant was one of the two people in the video, that the video showed defendant in possession of an item "consistent with a gun," and he identified a portion of the video that he believed showed defendant shooting Tukoyo. Defendant objected twice to Detective Twardesky's testimony, contending that it invaded the province of the jury[2] and that the video spoke for itself. The trial court overruled the objections because Detective Twardesky was allowed to testify about what he saw on the video and what he was looking for in his investigation. Because it does not seem that Detective Twardesky's testimony was relevant to his investigation, we must decide whether the trial court abused its discretion when it determined that Detective Twardesky could testify about his perceptions of the video.

Defendant claims Detective Twardesky's testimony that defendant was one of the two men in the video, that defendant was armed in the video, and that the video showed defendant shooting Tukoyo in the head was inadmissible. But Detective Twardesky's opinions were rationally based on his perception of the video. *Fomby*, 300 Mich App at 50. The detective explained his detailed process for reviewing the video footage, offering a sound basis for the opinions he formed. *Id*. at 51. Second, the testimony was helpful to the determination of a fact in issue. See MRE 701. The quality of the video is poor, making it difficult to see details. This is true of the original video and the enhanced video. When viewing the video, it would be easy to miss the movements Detective Twardesky described in his testimony. Accordingly, Detective Twardesky's testimony could help the jury discern the events depicted on the video. *Fomby*, 300 Mich App at 52. Thus, the testimony was permissible under MRE 701.

We must also consider whether the testimony invaded the province of the jury. Defendant asserts that it did, relying upon *People v Drossart*, 99 Mich App 66; 297 NW2d 863 (1980). This Court in *Drossart* provided context for the type of opinion that is improper, stating that "a witness is not permitted to tell the jury how to decide the case." *Id*. at 79. It additionally explained that "a witness is prohibited from opining on the issue of a party's negligence or nonnegligence, capacity or noncapacity to execute a will or deed, simple versus gross negligence," "criminal responsibility

---

[2] Defense counsel did not use that exact phrase, but he told the trial court that that was "what the jury's here for."

of an accused, or guilt or innocence." *Id*. at 79-80. But contrary to defendant's claim, Detective Twardesky's testimony was not an opinion on defendant's guilt or innocence. Instead, he testified about his perceptions watching the video. A witness is allowed to testify in the form of an opinion or inference that "embraces an ultimate issue to be decided by the trier of fact" if that testimony is otherwise admissible. MRE 704. We disagree with defendant's position that an opinion that "went directly to the issue before the jury" is the same as opining on defendant's guilt.

Also, Detective Twardesky's testimony did not invade the province of the jury if he was in a better position to see what the video depicted. See *Fomby*, 300 Mich App at 52. The poor quality of the video weighed in favor of a ruling that Detective Twardesky's testimony was necessary, see *Perkins*, 314 Mich App at 162, and the fact that the detective had repeatedly reviewed the video footage, including focusing on different aspects of the video as he re-watched it, put him in a better position than the jurors to see what the video depicted. See *Fomby*, 300 Mich App at 52. At the very least, the trial court's decision to admit this testimony was within the range of reasonable and principled outcomes, so the trial court did not abuse its discretion when it allowed the testimony.

Even if the trial court abused its discretion in permitting the testimony, that error does not require reversal. Error in the admission of testimony requires reversal only if it is more probable than not that the error affected the outcome of the trial. *Perkins*, 314 Mich App at 162, citing MCL 769.26. Here, the identity of defendant as the person who talked with Tukoyo and got into the car with him on September 30, 2020, was never in dispute. During closing argument, defense counsel did not suggest that it was anyone other than defendant who met and left with Tukoyo that night.

Additionally, it is clear from the requests the jurors made during deliberations that they did not simply accept Detective Twardesky's interpretation of the video, but instead tried to make their own interpretation of what the video depicted. During their deliberations, the jury asked to see the portion of the video showing defendant getting into the car, which was the point at which Detective Twardesky believed defendant shot Tukoyo. The jurors stated that they disagreed about what the video showed, which indicates that the jury was focused on reaching their own conclusions based on their perceptions of the video, and not merely based on Detective Twardesky's testimony, when deciding on defendant's guilt. Therefore, we cannot say that it is more probable than not that the error, to the extent there was one, affected the outcome of the trial. *Id*.

Defendant further argues that defense counsel was ineffective for failing to cite MRE 701 when objecting to Detective Twardesky's testimony. Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for defense counsel's error, the outcome of the trial would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Effective assistance of defense counsel is presumed, and the defendant bears a heavy burden to prove otherwise. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). The defendant "has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Defense counsel objected to Detective Twardesky's testimony twice. Counsel cited no rule of evidence during the objections, but counsel adequately explained that he was objecting because the jury was capable of viewing the video and determining what it depicted on its own. Defendant

-6-

has not shown that the objections fell below an objective standard of reasonableness. Furthermore, defendant has not shown the requisite prejudice. More specifically, defendant has failed to show how an objection, had it referred to MRE 701, would have had an effect on the court's ruling.

Defendant also argues that the detective's testimony amounted to expert testimony because it was based on his training and experience as a police officer, so the trial court erred by admitting that evidence from a witness that the court had not qualified as an expert. Under MRE 702, "[i]f the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Specifically, defendant challenges Detective Twardesky's testimony that (1) the trajectory of the bullet that killed Tukoyo was consistent with the detective's interpretation of the video, (2) the stippling on Tukoyo's face was consistent with his interpretation of the video, (3) defendant's movements were consistent with a man holding a gun, (4) an enclosed car would muffle the sound of a gunshot, and (5) the movement of Tukoyo's head in the video was consistent with somebody who was dead. Defendant asserts those portions of Detective Twardesky's testimony were based on his training and experience as an officer, and so the testimony was only admissible if Detective Twardesky had been qualified as an expert.

First, the record is not clear as to whether Detective Twardesky formed his opinions based on his training and experience as a police officer. Moreover, defendant has furnished no authority to suggest that a police officer testifying on the basis of training and experience must be qualified as an expert. Further, defendant does not explain how the testimony required "scientific, technical, or other specialized knowledge," and defendant has cited no authority in support of his contention that Detective Twardesky was required to be qualified as an expert. In fact, on many of the points, Detective Twardesky acknowledged he was not an expert, therefore indicating that he was merely providing a lay opinion. For example, he explained that he believed the bullet trajectory supported his interpretation of the video because a "bullet goes in a straight line" after it is fired. That opinion does not require specialized knowledge. Additionally, the testimony concerning the stippling did not require specialized knowledge because such specialized knowledge had already been provided by a medical examiner who testified that stippling indicates a shot was from close range. Detective Twardesky was merely applying that principle to his belief that the video showed defendant being shot at close range. Finally, testimony that an enclosed car muffles sound and a head moves in a certain way after an individual dies requires no specialized knowledge.

Detective Twardesky's testimony that defendant's acts were "consistent with [possessing] a gun" was likewise merely based on his perceptions. Contrary to defendant's position on appeal, Detective Twardesky did not testify that his conclusion that defendant had a gun was based on his training and experience as a police officer. In the portion of the transcript identified by defendant, the only reference to the detective's work as a police officer was a statement that whether someone was carrying a gun is "something that police officers would want to know . . . ." He did not suggest that his conclusion that defendant was holding a gun was based on scientific, technical, or other specialized knowledge. Moreover, this Court has held that when providing lay opinion testimony,

an officer "could properly comment that, based on his experience, the individual appeared to be concealing a weapon . . . ." *Perkins*, 314 Mich App at 161. Thus, defendant has failed to establish that the trial court abused its discretion when it admitted Detective Twardesky's testimony either as improper lay testimony or unqualified expert testimony.

## B. CELL PHONE SEARCH

Next, defendant insists he is entitled to a new trial because defense counsel was ineffective for failing to challenge the validity of the search warrant for his cell phone. Defendant asserts that the affidavit supporting the application for the search warrant failed to establish the requisite nexus between defendant's cell phone and the crimes police were investigating. A search warrant should be issued only if probable cause supports the warrant request. "Probable cause to issue a search warrant exists where there is a substantial basis for inferring a fair probability that contraband or evidence of a crime will be found in a particular place." *People v Kazmierczak*, 461 Mich 411, 417-418; 605 NW2d 667 (2000). Probable cause must be based on "facts presented to the issuing magistrate by oath or affirmation." *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009).

Defendant claims the affidavit submitted in support of the warrant to search his cell phone was inadequate because it did not contain allegations sufficient to establish a substantial basis for inferring a fair probability that evidence of the crime would be on his cell phone. But neither the search warrant nor the supporting affidavit is contained in the lower court record. Defendant has included what he purports to be the documents in his brief on appeal, but a party may not expand the record on appeal. *People v Powell*, 235 Mich App 557, 561 n 4; 599 NW2d 499 (1999). Thus, it is not proper for this Court to consider those materials that are not in the lower court record. *Id*. Confining our review to mistakes apparent on the record, see *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003), we believe that defendant has failed to establish the factual predicate for his claim of ineffective assistance, i.e., that defense counsel was ineffective for failing to challenge the search warrant for his cell phone.

## C. PHOTOGRAPHS

Defendant contends that his trial counsel was ineffective not just for failing to object to the admission of photographs of the victims, but also for stipulating to admission of the photographs. Defendant argues that "duplicative photos of Mr. Moore's severely burned body" as well as photos of Rimson and Tai'Raz were inadmissible. When a defendant pleads not guilty to an offense, "the prosecution may offer all relevant evidence, subject to MRE 403, on every element" of the crime. *People v Mills*, 450 Mich 61, 70; 537 NW2d 909 (1995). A defendant's offer to stipulate to certain elements does not alter this principle for those elements. *Id*. at 69 & n 5. "The claim that evidence that goes to an undisputed point is inadmissible has also been rejected in criminal cases." *Id*. at 70.

Here, defendant was charged with the premeditated killing of the three victims. Therefore, the prosecution was entitled to present all relevant evidence establishing that the victims died as a result of defendant's actions. Clearly, photographs showing the victims' bodies in deceased states were relevant, and thus admissible, subject only to restrictions imposed by MRE 403. *Id*. Pursuant to MRE 403, the trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." "Evidence is unfairly prejudicial when there

exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2001). Photographs are not inadmissible simply because a witness can testify about the information the photographs depict. *Mills*, 450 Mich at 76. Moreover, photographs are admissible to corroborate a witness's testimony, and a photograph's "[g]ruesomeness alone need not cause exclusion." *Id.* The proper analysis is whether the photograph's probative value is substantially outweighed by unfair prejudice. *Id.*

Defendant's argument on this issue is vague. In his brief on appeal, he acknowledges that there were dozens of photographs admitted into evidence and that, "[w]hile not all of the photos introduced at trial were inadmissible, duplicative photos of Mr. Moore's severely burned body were." But defendant does not specify which exhibits were "duplicative" and, thus, inadmissible. The only reference to allegedly duplicative photographs is defendant's statement that "[m]any of the photos were duplicative, as evidenced by the medical examiners [sic] testimony that they were 'similar' to the others previously shown." The transcript cited by defendant shows that the medical examiner testified that the photograph admitted as Exhibit 75 was "similar" to the photograph that was admitted as Exhibit 74, but he noted that Exhibit 75 had "more light" and showed the entrance wound "clearer." Defendant has failed to show how the admission of both Exhibits 74 and 75— as opposed to only one of them—had the potential to unduly influence the jury. Moreover, if the photographs were cumulative evidence, then they could not have been decisive in the outcome of the case. See *People v Mackey*, 168 Mich App 154, 156; 423 NW2d 604 (1988).[3] Consequently, defendant has failed to show that the probative value of both Exhibits 74 and 75 was substantially outweighed by the danger of unfair prejudice.

Defendant's brief suggests that he is challenging the admission of many more photographs than just Exhibits 74 and 75. But without specifying which photographs were inadmissible under MRE 403, defendant necessarily is leaving it to this Court to sort through dozens of photographs to determine which ones are purportedly "duplicative." "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims," *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998), or "to search for a factual basis to sustain or reject his position," *People v Traylor*, 245 Mich App 460, 464; 628 NW2d 120 (2001). Therefore, with the exception of Exhibits 74 and 75, we deem this issue abandoned.

To the extent that defendant argues that all of the photographs of Rimson and Tai'Raz are inadmissible because "their cause and location of death was not in question," that claim is without merit. A defendant's offer to stipulate to any particular fact does not relieve the prosecution of its burden to prove each and every element of a charged offense beyond a reasonable doubt. *Mills*, 450 Mich at 69-70, 70 n 5. Thus, regardless of whether the causes and locations of the deaths of Rimson and Tai'Raz were not seriously in dispute, that did not lessen the prosecution's obligation to present evidence to show that they had been killed in a manner that violated MCL 750.316(1)(a).

---

[3] Court of Appeals cases decided before November 1, 1990, are not binding. MCR 7.215(J)(1). Although this Court is not "*strictly required* to follow uncontradicted opinions from this Court decided prior to November 1, 1990," those opinions are "nevertheless considered to be precedent and entitled to significantly greater deference than are unpublished cases." *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018).

Therefore, we reject defendant's bald assertion that *all* of the photographs of Rimson and Tai'Raz should not have been admitted at trial

Defendant asserts that defense counsel was ineffective for failing to object to the admission of the gruesome photographs, so he has the burden of proving the factual predicate for his claim of ineffective assistance. *Hoag*, 460 Mich at 6. A defense attorney is not ineffective for failing to make a meritless objection. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Having rejected defendant's challenge to the admission of the photographs at trial, we necessarily reject his position that defense counsel was ineffective for failing to object to the admission of the relevant yet gruesome photographs of the horrific damage that defendant did to three people.

## D. SPECIFIC UNANIMITY

Defendant contends that he was denied his constitutional right to a unanimous jury verdict because the jury should have been given a specific unanimity instruction.[4] Defendant asserts that defense counsel preserved that issue for appellate review by objecting to the instructions at trial, but his argument is belied by the record, which is void of any objection to the unanimity instruction given to the jury and contains no request for a specific unanimity instruction. Thus, that issue is unpreserved, see *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012), and we review the claim for plain error that affected defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Alternatively, defendant argues that his counsel was ineffective for failing to request a specific unanimity instruction. Defendant's arguments are totally meritless.

"A defendant has the right to a unanimous verdict and it is the duty of the trial court to properly instruct the jury on this unanimity requirement." *People v Martin*, 271 Mich App 280, 338; 721 NW2d 815 (2006). "Under most circumstances, a general instruction on the unanimity requirement will be adequate." *Id*. Such an instruction informs the jury that their verdict must be unanimous and that it is necessary that each of the jurors agrees on that verdict. M Crim JI 3.11(3). But if "the state offers evidence of multiple acts by a defendant, each of which would satisfy the actus reus element of a single charged offense, the trial court is required to instruct the jury that it must unanimously agree on the same specific act if the acts are materially distinct or if there is reason to believe the jurors may be confused or disagree about the factual basis of the defendant's guilt." *People v Cooks*, 446 Mich 503, 530; 521 NW2d 275 (1994). In contrast, if "a statute lists alternative means of committing an offense which in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theory." *People v Johnson*, 187 Mich App 621, 629-630; 468 NW2d 307 (1991).

Defendant identifies first-degree premeditated murder and felony murder as two separate offenses and asserts that the trial court could not treat them as alternative theories for establishing guilt on a single charge. Defendant insists the "jury was not instructed that it had to be unanimous as to which theory they found him guilty of beyond a reasonable doubt," so the jury "was free to convict him of either crime or some combination of both." But that argument is based on a gross

---

[4] In his brief on appeal, defendant refers to the jury instruction as a "special unanimity" instruction. It appears that this is a seldom-used synonym for a "specific unanimity" instruction.

misinterpretation of the record. Defendant's argument is premised on the belief that the jury was asked to render a verdict on a single count of murder as to each victim, with alternative theories of either premeditated murder or felony murder. But that is not the case. Defendant faced separate charges of premeditated murder and felony murder with respect to each victim, so the jury was not presented with alternative theories of the same offense. Consistent with the jury instructions, the verdict form required the jury to enter distinct verdicts for each count. The trial court explicitly instructed the jury that "[a] verdict in a criminal case must be unanimous. It is necessary that each of you agrees — agree on that verdict." The jury's verdicts reflect that defendant committed *both* premeditated murder and felony murder of each victim. Defendant has not identified any authority that a specific unanimity instruction is appropriate when, as here, defendant faced different charges relating to the same conduct, i.e., separate charges of first-degree premeditated murder and felony murder for the killing of the same victim. Thus, defendant's argument that the jury in his case was not required to render a unanimous verdict is completely without merit.

## E. DEFENDANT'S STANDARD 4 BRIEF

Defendant advances many fleeting and undeveloped arguments in a Standard 4 brief,[5] but none has merit and few, if any, involve issues that were preserved. This Court reviews unpreserved claims for plain error that affected substantial rights. *Carines*, 460 Mich at 763-764.

First, defendant argues his due-process rights were violated by the admission of "doctored" evidence. Defendant appears to suggest that the video from his driveway was "heavily doctored" and should not have been admitted into evidence. At trial, the prosecution presented a version of this video that was zoomed in and enhanced for clarity. But nothing in the record indicates that the video was modified in a manner that depicted events that did not happen or were not actually depicted on the original video. Thus, defendant's argument is without merit. Similarly, defense counsel was not ineffective for failing to object to that evidence on that basis. See *Ericksen*, 288 Mich App at 201.

Defendant claims he was denied the effective assistance of counsel because his trial counsel did not consult or hire an expert. Defendant does not specify the type of expert he believes should have been obtained or consulted, but he insists that his attorney should have done more than just "challenge the testimony of the prosecutor's expert witness," and instead should have relied upon an expert to transform the case into a "battle of the experts." The prosecution, however, presented several experts, not just one, so it is unclear which expert defendant thought should be challenged. Defendant avers that if an expert had been consulted, the prosecutor would not have "been able to show my jury the doctored footage." Assuming defendant is claiming that his trial counsel should have obtained an expert on video or video enhancement, he has not established the requisite factual predicate for such a claim. See *Hoag*, 460 Mich at 6. Nothing in the record reveals what such an expert would have said on defendant's behalf. The record evidence shows that Sergeant Curtis zoomed in the pertinent portion of the video and enhanced it to remove some blurriness that occurs when pictures or videos are enlarged. Aside from defendant's claim that the video was "doctored," no evidence suggests that anything impermissible or untoward happened to the video. Indeed, our

---

[5] See Administrative Order No. 2004-6, 471 Mich c, cii (2004).

-11-

review of the regular video shows the same movements as in the zoomed-in version, but on a much smaller scale. Accordingly, defendant has not established that defense counsel's performance fell below an objective standard of reasonableness based on counsel's failure to consult a video expert. Moreover, defendant has not shown that an expert would have offered testimony that would have benefited him, let alone created a reasonable probability that the result of the trial would have been different.

Affirmed.

/s/ Christopher P. Yates
/s/ Stephen L. Borrello
/s/ Kristina Robinson Garrett