*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 18, 2024

Plaintiff-Appellee,

v

Nos. 364828; 364829
Huron Circuit Court
LC Nos. 22-306768-FH; 22-306769-FH

JASON DAVID BLACKSTOCK,

Defendant-Appellant.

Before: MARKEY, P.J., and BORRELLO and GARRETT, JJ.

PER CURIAM.

In May 2021, after 11 years of marriage, defendant, Jason David Blackstock, and his ex-wife, BB, divorced. A few months later, BB secured a personal protection order (PPO) from the court in response to Blackstock's near-constant texts, calls, and demands to know where she was. Despite the PPO, Blackstock continued to harass BB via a court-sponsored application. In Docket No. 364828, Blackstock was charged with aggravated stalking, MCL 750.411i, and using a computer to commit a crime, MCL 752.796(1) and MCL 752.797(3)(d), for his failure to comply with the PPO. After his arraignment on these charges, Blackstock was released on bond with a pretrial release order instructing him to, once again, refrain from communicating with BB. Yet on the day of his arraignment, and for several days following, Blackstock continued to personally attack BB through a barrage of messages. Accordingly, in Docket No. 364829, Blackstock was charged for the second time with aggravated stalking and using a computer to commit a crime. At a joint trial for both cases, a jury found Blackstock guilty as charged.

On appeal, Blackstock argues that he is entitled to the vacation of his convictions and a new trial because the trial court plainly erred when it admitted testimony from two police officers that Blackstock violated the PPO and pretrial release order. Blackstock also argues that he was denied the effective assistance of counsel because trial counsel did not object to this testimony. However, viewed in context, the officers were not giving their opinion on Blackstock's guilt, but were explaining their investigative process. Moreover, trial counsel did not act ineffectively by failing to raise a meritless objection. For these reasons, we affirm.

# I. BACKGROUND

Blackstock and BB divorced in May 2021 and BB secured a PPO against Blackstock in October 2021. The PPO specifically forbade Blackstock from communicating with BB, from being within BB's sight, from entering onto property occupied by BB, and from placing an object onto property owned, leased, or occupied by BB. Blackstock and BB were ordered to communicate about matters relating to their children through a third-party court application called "App Close." Otherwise, there was to be no direct communication between BB and Blackstock.

On the morning of January 19, 2022, Blackstock messaged BB to ask why he did not receive tickets to a school benefit dinner for their son. The conversation quickly devolved into an argument, with Blackstock insulting BB, calling her "selfish" and "inconsiderate," making comments about her relationship with her boyfriend, JF, and telling her that he does not "deserve to be treated the way you treat me." BB responded to some of these messages, noting that Blackstock was "back to being mean and nasty." The conversation ended with the following exchange:

> *Blackstock*: I will tape one of your nice pictures to my back tonight, so you have something to stare at.
>
> *BB*: I have tried to keep this means of communication open but once again you have taken advantage of it.
>
> *Blackstock*: I have nothing else to say to you, so I won't be sending you messages anymore. You put a hate inside of me that I don't have to deal with. It's negativity like yours that I can do without. I hope you and [JF] enjoy my sign tonight and your lives together. Everyone should get married 3 times. Have you ever thought where the real problem is, if there has already been 2 failed marriages. Maybe it's time to look in the mirror.

That evening, BB attended her son's basketball game with JF, arriving in JF's truck. When BB entered the gym, Blackstock stuck his middle finger up at her and JF. At around halftime, Blackstock left the gym. After the game, BB and JF returned to their vehicle and found a folded-up piece of paper on the windshield, containing a nude photograph of BB that she shared only with Blackstock. BB contacted the police, and Bad Axe Police Officer Nate Flores responded. When Officer Flores interviewed BB, she explained how she found the photograph and where in the parking lot they parked JF's vehicle. Bad Axe Police Officer Scott Zaleski continued the investigation the next day. The police secured high school surveillance footage from the night before, which showed an individual matching Blackstock's description approach JF's truck in the parking lot around halftime.

On January 28, 2022, BB attended her son's basketball game and saw Blackstock once again. Officer Zaleski was also present and observed Blackstock relocate seats when BB arrived, sitting with an individual behind her. Officer Zaleski ultimately arrested him. Blackstock was

charged with one count of aggravated stalking[1] for his conduct on January 19, 2022, and was arraigned on January 31, 2022. Blackstock received a bond with a pretrial release order that further prohibited him from contacting BB unless it related to their children. After the arraignment, Blackstock contacted BB through App Close. Over the course of four days, Blackstock sent BB 57 messages, with BB responding only 18 times. Blackstock messaged BB that he would like to "thank" her for not being able to attend their son's basketball games anymore, and for "making" him and their son miss a game that he bought his son tickets to for Christmas. Blackstock also called BB's attitude "rotten," and asked her why she was awake at 2:00 a.m. In a separate file, Blackstock was charged again with aggravated stalking.[2]

At trial, Blackstock admitted that the court entered a PPO against him in October 2021. When confronted with the App Close messages, Blackstock attempted to relate each conversation back to his children. For instance, Blackstock testified that calling BB selfish related to his children because he believed her actions regarding their son's benefit tickets were selfish. However, Blackstock ultimately admitted that several of his messages did not relate to his children at all, and were rather about his feelings, basketball, or the conflict between himself and BB. Blackstock did not deny that he sent the messages admitted at trial. The jury found Blackstock guilty as charged, and this appeal followed.

## II. INVADING THE PROVINCE OF THE JURY

Blackstock challenges the admission of evidence in which Officers Flores and Zaleski testified that he violated his PPO and pretrial release order. Because Blackstock's claim of appeal regards specific testimony, we quote the exact exchanges from the transcript.

Regarding the issuance of the PPO, the prosecution asked Officer Flores the following questions:

*Q.* . . . And so after reviewing the personal protection order . . . was it your understanding that Mr. Blackstock could have no contact with [BB]?

*A.* Correct.

*Q.* That he could not appear within her sight according to this document, is that correct?

*A.* That's correct.

*Q.* And that he could not place an object on property owned, leased, or occupied by her?

---

[1] Blackstock was originally charged with only aggravated stalking. The information was later amended to include a second count for using a computer to commit a crime.

[2] Like above, Blackstock was originally charged with only aggravated stalking. The information was later amended to include a second count for using a computer to commit a crime.

*A.* That's correct.

Officer Flores testified that he saw the messages between Blackstock and BB on January 19, 2022, and the photograph found on the truck. The prosecution then asked:

*Q.* At this point in your investigation after seeing the photograph and after reviewing the text messages, *did you believe that a violation of the personal protection order had occurred*?

*A.* Yes, I did.

*Q.* And what were the next steps then in your investigation?

*A.* From there I wanted to get video from the Bad Axe High School regarding the picture being left on [JF's] truck.

*Q.* And we heard reference in your body cam video that you were going to send day shift, Officer Zaleski, to retrieve that video?

*A.* That is correct.

*Q.* And is that what you did?

*A.* Yes.

During cross-examination, defense counsel questioned Officer Flores about whether BB responded to Blackstock's messages on App Close, and whether there was any video showing Blackstock sitting inside the gym. Officer Flores testified that BB responded to Blackstock several times and that there was no video of Blackstock in the gym. On redirect, the prosecution asked:

*Q.* Why wasn't it that you didn't try to locate Mr. Blackstock that evening?

*A.* I wanted to gather more evidence regarding the complaint.

*Q.* And once again just to reiterate based upon counsel's question, *was it your understanding that placing an object on or delivering an object to property owned, leased, or occupied by the petitioner was prohibited by the personal protection order*?

*A.* Correct.

Regarding the high school surveillance video, the prosecution asked Officer Zaleski:

*Q.* Okay. And after reviewing this video, *was it your belief that a violation of the personal protection order had taken place*?

*A.* Yes.

*Q.* Because was it your understanding that Mr. Blackstock was to have no contact whatsoever with [BB]?

*A.* Yes.

*Q.* What was the next step in your investigation?

*A.* Once I had obtained, or contacted [the school], I did attempt to arrest Mr. Blackstock *for the PPO violation* and was unsuccessful. He was either not home or would not come to the door.

The prosecution also asked Officer Zaleski the following questions regarding Blackstock's conduct at the January 28, 2022 basketball game:

*Q.* And is it your understanding through your investigation as well as your briefing from Officer Flores that Mr. Blackstock was prohibited from following the petitioner, that being [BB], or appearing within her sight?

A. Yes.

Q. And so what did you do at that point *when you saw this violation* taking place in front of you?

A. Attempted to—well contacted Mr. Blackstock.

Finally, regarding the messages that Blackstock sent to BB following his arraignment, the prosecution asked Officer Flores:

*Q.* . . . So those text messages cover a span of dates after Mr. Blackstock was arraigned on the initial charge for which you arrested him, is that correct?

*A.* That's correct.

*Q.* And is it fair to say that the personal protection order was still in effect?

*A.* It was.

*Q.* In addition to the conditions of bond set by the District Court?

*A.* That's correct.

*Q.* Both of those things were in effect?

*A.* Correct.

*Q.* Based upon the next segment of your investigation after Mr. Blackstock's initial arraignment *did you believe that the Defendant had once again violated* the . . . terms of the personal protection order and the conditions of his bond?

-5-

*A.* Yes.

*Q.* And what did you do?

*A.* I believe Mr. Blackstock had already been back in custody so I submitted a warrant request to the Prosecutor's Office.

Blackstock asserts that, because the jury needed to determine whether he violated these orders to convict him of aggravated stalking and using a computer to commit a crime, this testimony improperly invaded the province of the jury. Relatedly, Blackstock argues that his trial counsel acted ineffectively by failing to object to the entry of this testimony at trial.

## A. STANDARD OF REVIEW

Blackstock concedes that he did not object to the challenged testimony at trial. Accordingly, this evidentiary issue is unpreserved. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Unpreserved evidentiary issues are reviewed for plain error affecting substantial rights. *Id.* Under this standard, a defendant must show that an error occurred, that it was clear or obvious, and that it caused prejudice, i.e., that the error affected the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "Reversal will only be warranted when the plain error leads to the conviction of an actually innocent defendant or when an error affects the fairness, integrity, or public reputation of judicial proceedings." *People v Bailey*, 330 Mich App 41, 54; 944 NW2d 370 (2019) (cleaned up).

"Whether the defendant received the effective assistance of counsel guaranteed him under the United States and Michigan Constitutions is a mixed question of fact and law." *People v Ackley*, 497 Mich 381, 388; 870 NW2d 858 (2015). Questions of constitutional law are reviewed de novo, meaning that this Court reviews "the issues independently, with no required deference to the trial court." See *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019). Because Blackstock did not move for a new trial or an evidentiary hearing, or request that we remand for an evidentiary hearing, our review is limited to mistakes apparent on the existing record. See *People v Jackson*, 313 Mich App 409, 431; 884 NW2d 297 (2015).

## B. DISCUSSION

It is generally impermissible for a witness to testify about a defendant's guilt or innocence. *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013). Accordingly, a police officer "may not opine about the defendant's guilt or innocence in a criminal case." *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012). "Where a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." *People v Perkins*, 314 Mich App 140, 161-162, 885 NW2d 900 (2016) (cleaned up), superseded in part on other grounds sub nom *People*

*v Hyatt*, 316 Mich App 368, 891 NW2d 549 (2016).  However, under MRE 701,[3] a lay witness may offer opinion testimony so long as "testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue."  Under MRE 704, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Thus, although an officer may not assert his opinion regarding a defendant's guilt, he may explain the basis of an opinion resulting from the steps of an investigation based on his personal perception.  See *Heft*, 299 Mich App at 83.

Aggravated stalking occurs when an individual engages in stalking with another aggravating circumstance, such as "[a]t least 1 of the actions constituting the offense is in violation of a restraining order and the individual has received actual notice of that restraining order or at least 1 of the actions is in violation of an injunction or preliminary injunction."  MCL 750.411i(2)(a).  Aggravating stalking may also occur when "[a]t least 1 of the actions constituting the offense is in violation of a condition of probation, a condition of parole, a condition of pretrial release, or a condition of release on bond pending appeal."  MCL 750.411i(2)(b).

The Michigan and United States Constitutions require that criminal defendants receive the assistance of counsel in their defense.  Const 1963, art 1, § 20; US Const Am VI.  "The right to counsel . . . is the right to the effective assistance of counsel."  *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016).  "To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different."  *Id*.  "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise."  *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019) (quotation marks and citation omitted).  This burden includes "overcom[ing] the strong presumption that counsel's performance was born from a sound trial strategy."  *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).  "But a court cannot insulate the review of counsel's performance by calling it trial strategy; counsel's strategy must be sound, and the decisions as to it objectively reasonable."  *Ackley*, 497 Mich at 388-389 (quotation marks and citation omitted).  "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel."  *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Although Blackstock is correct that the question of whether he violated his PPO or pretrial release order was an ultimate issue in the case, see MCL 750.411i(1)(a) and (b), Blackstock fails to demonstrate that admission of the officers' testimony was a plain error affecting his substantial rights.  To support his claim of error, Blackstock relies significantly on *People v Bragdon*, 142

---

[3] The Michigan Rules of Evidence were amended on September 20, 2023, effective January 1, 2024.  This opinion relies on the version of the rules in effect at the time this matter was decided by the trial court.

Mich App 197, 199; 369 NW2d 208 (1985).[4]  In *Bragdon*, 142 Mich App at 199, this Court held that a prosecutor invaded the province of the jury when he asked the defendant, " 'So you're guilty of the crime?' "  According to this Court, the prosecution's question was impermissible because it essentially sought to obtain a guilty plea "by directly questioning the defendant on the ultimate issue of guilt" despite the defendant's plea of not guilty.  *Id.*  "[W]hile defendant may have admitted the existence of the elements of the offense, it is solely within the jury function to find the facts and to determine the guilt or innocence of the accused."  *Id*. at 199-200.  Blackstock asserts that the present case is similar to *Bragdon*, 142 Mich App at 199, because the officers' testimony about the PPO and pretrial release order went to an essential element of the offense and was integral to each officer's testimony at trial.

However, in the challenged exchanges here, unlike in *Bragdon*, 142 Mich App at 199, neither officer specifically testified that Blackstock was guilty of the charged offenses.  Rather, the officers explained the investigative measures they took after they perceived that Blackstock violated his court orders.  For instance, in the challenged exchanges between Officer Flores and the prosecution, Officer Flores testified that he intended to obtain surveillance video from the high school to investigate the alleged offense after he believed Blackstock violated his PPO.  Officer Flores testified further that he did not immediately try to locate Blackstock because he wanted to gather more evidence first.  In another exchange between Officer Zaleski and the prosecution, Officer Zaleski testified that, after he saw the surveillance footage and believed a violation of the PPO occurred, he attempted to arrest Blackstock but did not succeed.  This helped explain why the officers did not arrest Blackstock until January 28, 2022, when the offense took place on January 19, 2022.  In the last challenged exchange, Officer Flores again explained that he submitted a warrant request to the prosecution's office after he believed there was another violation of the PPO and the pretrial release order.  This testimony was based on the officers' personal perceptions and chronologically explained the investigative steps they took throughout the case.  See *Heft*, 299 Mich App at 83.  Although these statements were made multiple times during trial, it would be a mischaracterization of the testimony to conclude that the officers impermissibly opined on defendant's guilt.  Therefore, this testimony did not invade the province of the jury and the trial court did not plainly err by permitting its admission.  See *id*.; *Carines*, 460 Mich at 763.

Even if this testimony was improper, Blackstock fails to show that he was prejudiced by its admission.  There was ample evidence that Blackstock violated the terms of his PPO and pretrial release order.  Blackstock admitted that he knew there was a PPO in place and that he was not permitted to communicate with BB, but sent messages to BB that were not exclusively about their children on January 19, 2022.  Although BB responded to some of those messages in a manner that did not relate to the children, Blackstock inundated BB with messages and followed up hours after BB stopped responding.  Blackstock also admitted that he threatened to print a nude photograph of BB and wear it on his back at their son's basketball game.  This photograph was ultimately found on JF's truck, and a surveillance video from that evening showed an individual matching Blackstock's description approach JF's vehicle.  There was also evidence that

---

[4] Opinions of this Court issued before November 1, 1990, are not strictly binding under MCR 7.215(J)(1), but are generally afforded some deference unless contradicted by more recent caselaw. *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114; 923 NW2d 607 (2018).

Blackstock stuck his middle finger up at BB and JF at the January 19, 2022 basketball game. Blackstock admitted further that, after he was released on bond, he continued to message BB about issues unrelated to the children. Copies of the messages from January 19, 2022, and January 31, 2022 through February 3, 2022, were admitted as exhibits at trial. Accordingly, even without the officers' testimony, the jury could have rationally concluded that Blackstock violated the terms of his PPO and his pretrial release order. Therefore, any error in admitting this evidence was not outcome-determinative.

Even more, the trial court instructed the jurors that they were the ultimate triers of fact and that they had the discretion to believe or discredit any testimony that they wished. The jury presumably followed the trial court's instructions and determined the issue of whether Blackstock violated his PPO and pretrial release order for itself. See *People v Henry*, 315 Mich App 130, 150; 889 NW2d 1 (2016). Defendant has therefore failed to show that any error led "to the conviction of an actually innocent defendant" or affected "the fairness, integrity, or public reputation of judicial proceedings." *Bailey*, 330 Mich App at 53-54 (cleaned up).

Because the officers' testimony was not admitted in error, trial counsel's failure to object to the challenged testimony did not amount to ineffective assistance of counsel. See *Ericksen*, 288 Mich App at 201. For the reasons stated above, Blackstock also fails to demonstrate that there is a reasonable probability that, but for this alleged error, the result of the proceedings would have been different. See *Shaw*, 315 Mich App at 672. Therefore, Blackstock's ineffective assistance of counsel claim lacks merit.

We affirm.


/s/ Jane E. Markey
/s/ Stephen L. Borrello
/s/ Kristina Robinson Garrett